**Daniel J. SHARKEY, Plaintiff,**

v.

**LASMO (AUL LTD.) and Ultramar Corporation, Defendants.**

**No. 94 Civ. 4699(WCC).**

United States District Court,
S.D. New York.

July 7, 1999.

Silver Golub & Teitell LLP, Stamford, Connecticut, Cuddy & Feder & Worby, LLP, White Plains, New York, David S. Golub, Jonathan M. Levine, Thomas R. Beirne, of counsel, for plaintiff.

Robinson Brog Leinwand Greene, Genovese & Gluck P.C., New York City, Michael F. Fitzgerald, Adam J. Ableman, of counsel, for defendant Ultramar Corporation.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

After a seven-day jury trial that concluded on April 8, 1998, the jury awarded Daniel Sharkey ("plaintiff") damages of $1,427,200 against defendant Ultramar Corporation ("defendant"),[1] finding that the defendant had violated the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq., while plaintiff was in the corporation's employ. Defendant filed a timely motion for judgment as a matter of law pursuant to Fed. R.Civ.P. 50(b) or, in the alternative, a new trial under Fed.R.Civ.P. 59(a). For the reasons stated herein, defendant's motion is denied.

## BACKGROUND

The facts concerning this action are set forth in the Court's three prior decisions, *Sharkey v. Lasmo,* 15 F.Supp.2d 401 (S.D.N.Y.1998); 992 F.Supp. 321 (S.D.N.Y. 1998); 906 F.Supp. 949 (S.D.N.Y.1995), and familiarity with those opinions is presumed. The facts pertinent to the instant motion are as follows. Plaintiff had been employed by Ultramar Energy Limited ("UEL") in its Tarrytown, New York offices. UEL was a subsidiary of Ultramar PLC. In early 1992, a corporation named Lasmo took control of Ultramar PLC and its subsidiaries, including UEL. In or about June of 1992, pursuant to a corporate re-organization plan, Lasmo decided to close down UEL's Tarrytown operations and consolidate functions previously performed there into the company's Montreal, Canada location. As part of this reorganization, Lasmo formed defendant Ultramar Corporation, a shell corporation with no business activities. Three UEL vice-presidents, specifically plaintiff, Michael Kuzmin, and Patrick McAward, were all given offers to re-locate to Montreal. Plaintiff was fifty-nine years old at this time,

whereas Kuzmin was forty-two and McAward was thirty-five. Plaintiff claimed that, due to his age, he was given a substantially less favorable offer to re-locate than the two other vice-presidents. After protesting this disparity to no avail, plaintiff declined defendant's offer of employment and subsequently commenced the action presently before this Court. The jury found for plaintiff as against Ultramar Corporation, but found that Ultramar's co-defendant Lasmo was not liable.

## DISCUSSION

I. *Defendant's Claims for Judgment as a Matter of Law*

A. *Legal Standard*

■ Claiming insufficiency of evidence, defendant moves this Court to vacate the jury's verdict and grant judgment for defendant pursuant to Fed.R.Civ.P. 50(b) or, in the alternative, to order a new trial under Rule 59. The standards for determining Rule 50(b) and Rule 59 motions are different—Rule 59 motions for a new trial are resolved under a less stringent standard than Rule 50(b) motions for judgment as a matter of law. *See, e.g., Mono v. Peter Pan Bus Lines, Inc.,* 13 F.Supp.2d 471, 475 (S.D.N.Y.1998); *Martinez v. Gayson,* No. 95 Civ. 3788(ILG), 1998 WL 564385, *3 (E.D.N.Y. June 30, 1998); *Mahoney v. Canada Dry Bottling Co.,* No. 94 Civ. 2924(FB), 1998 WL 231082, *4 (E.D.N.Y. May 7, 1998).

■ As the Court of Appeals has instructed in assessing Rule 50(b) motions, district courts are required to:

> consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. The court can-

---

1. While Ultramar Corporation was not the sole defendant at trial, since it is the only defendant now moving to vacate the verdict, we will refer to the company simply as "defendant."

not assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury[.]

*LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 429 (2d Cir.1995) (internal quotations omitted). A Rule 50(b) motion should only be granted where there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against the moving party...." *Id.* (internal quotations omitted).

■ In contrast, under Rule 59 a district court need not view the evidence in the light most favorable to the non-movant and the court may independently weigh the evidence. *See Song v. Ives Laboratories, Inc.,* 957 F.2d 1041, 1047 (2d Cir. 1992). However, the standard to order a new trial is still a strenuous one. The standard by which such a motion is judged is whether "the jury has reached a seriously erroneous result or ... [a] verdict [that] is a miscarriage of justice." *Id.* (internal quotations omitted). In applying this standard,

> [t]he trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts; and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice.

*Bevevino v. Saydjari,* 574 F.2d 676, 684 (2d Cir.1978).

As to the Rule 50(b) motion, for the reasons that follow, we find that there was sufficient evidence to sustain the verdict. As to the Rule 59 motion, we do not believe that this verdict is seriously erroneous or represents such a miscarriage of justice as would warrant a new trial.

**B.** *Defendant's Claim of Insufficient Evidence of Discrimination*

■ Defendant claims that the evidence presented at trial was so insufficient that we are required to vacate the verdict and either enter judgment for defendant or order a new trial. More precisely, defendant argues that plaintiff failed to meet its burden for proving an ADEA claim under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas,* plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If plaintiff satisfies this burden, the employer must then "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell,* 411 U.S. at 802, 93 S.Ct. 1817. If this is done, the plaintiff has the burden "to show that [the employer's] stated reason ... for [its treatment of plaintiff was] in fact pretext." *Id.* at 804, 93 S.Ct. 1817.

While both plaintiff and defendant use their post-trial briefs to engage in a lengthy analysis of whether defendant presented a legitimate non-discriminatory reason for their actions in response to plaintiff's prima facie showing of discrimination, their argument miss the main point. It is well-established that the burden of meeting the first two requirements of the *McDonnell Douglas* test is an easy one. *See Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47 (2d Cir.1998); *Viola v. Philips Medical Sys.,* 42 F.3d 712 (2d Cir.1994). Few post-trial motions, if any, should turn on either of these factors, since plaintiff's failure to make even a prima facie showing of discrimination or defendant's failure to present any legitimate non-discriminatory reason for its actions should reveal itself well before the post-trial stage. As will be explained further, the first two *McDonnell*

*Douglas* steps were easily satisfied in this case. This motion, like most post-trial motions of this type, turns on the third *McDonnell Douglas* factor: was there sufficient evidence to show that the reason given by defendant for treating plaintiff differently from other similarly situated employees was a merely pretextual justification for discrimination? Although evidence was submitted to show that the defendant's proffered reason for its actions was mere pretext, this does not necessarily compel a verdict for plaintiff, because the ultimate burden of proving discrimination still rests with plaintiff. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). It does, however, permit the trier of fact to infer that discrimination occurred. *Id.* For the reasons stated below, we hold that there was sufficient evidence presented at trial to satisfy us that the jury's verdict should not be set aside. Plaintiff cast sufficient doubt on defendant's proffered reasons for the employment decisions it made regarding plaintiff that a reasonable jury could infer that the real reason for defendant's actions was age discrimination.

Before demonstrating the sufficiency of the evidence on the issue of pretext, however, we comment briefly on plaintiff's prima facie showing of discrimination. First, there was clear disparity between the treatment of plaintiff and two similarly situated but younger vice-presidents in the offers to relocate to Montreal. McAward and Kuzmin were offered: 1) increases of 11% in salary for McAward and 6% for Kuzmin; 2) stock options in the new company equal in value to one year's salary; 3) restricted stock in the company equal in value to one-half of a year's salary; 4) participation in the company's bonus plan, with a minimum bonus equal to 15% in salary; 5) annually renewable relocation benefits to cover the expense of relocating and living in a foreign country; and 6) a two-year renewable term of employment with a severance guarantee equaling two years of payment (as long as McAward and Kuzmin worked a minimum of eighteen months for the company).

In contrast, plaintiff presented credible evidence that he was offered only: 1) a limited, non-renewable two-year term of employment, during which time he was to train his successor; 2) a $20,000 decrease in salary; and 3) a severance payment, if he remained employed for the full two years, equal to two-thirds of one-year's salary. Plaintiff was not offered stock options or restricted stock in the new company, nor offered bonus plan participation, nor relocation benefits. While defendant suggested that many of these perquisites were not offered simply because "negotiations with plaintiff never reached [that] point," Defendant's Reply Memorandum of Law at 6–7, the jury was certainly entitled to disbelieve that explanation.

In addition to this disparate treatment, plaintiff presented credible testimony that he was to train his successor during his two-year period of employment, even though there was to be a continuing need for plaintiff's job function and defendant had been fully satisfied with plaintiff's performance. Trial Transcript at 722. Further, plaintiff introduced deposition testimony at trial of Patrick Guarino, a Senior Vice–President who was involved in the decision to make plaintiff the disputed job offer, in which he explained McAward's more favorable offer as in part justified because he was "an up-and-coming young guy." *Id.* at 306. While this Court does not believe such a comment to be "smoking gun" evidence of discrimination, as claimed by plaintiff, the jury was certainly entitled to consider it as some evidence of discriminatory intent.

Finally, the jury was presented with evidence that could indicate a desire by the defendant corporation to force older employees into retirement. First, plaintiff introduced a service agreement prepared by an Ultramar PLC subsidiary, American Ultramar Limited ("AUL") in which the company specifically contracted that some of the perquisites offered to its employees

"shall not be extended beyond the Employee's attainment of age sixty-five." Pl. Ex. 58. Clearly, a reasonable jury could draw an inference of intent to discriminate from such a document. Similarly, plaintiff presented a document prepared by defendant's human resource department that assumed the age of sixty years as a retirement age for Ultramar employees. Pl.Ex. 6. Defendant argued at trial that this age was a mere random selection chosen by the human resources department in an effort to demonstrate how to calculate projected benefits, whereas plaintiff argued that the choice of age sixty demonstrated a desire within the corporation to force out older employees. Given these two disputed interpretations of a document in evidence, the jury could reasonably infer that this document revealed the company's bias for retirement at the indicated age.[2]

After this prima facie case was established, defendant came forward with a legitimate non-discriminatory reason for plaintiff's disparate job offer. Specifically, defendant claimed that because McAward and Kuzmin possessed written service agreements providing numerous benefits, the corporation had to make more favorable offers to them to induce them to relinquish those benefits. Yet, for every benefit offered to McAward and Kuzmin but not to plaintiff, plaintiff presented plausible arguments that defendant's rationalizations did not justify the added incentives. At trial, plaintiff presented sufficient evidence to permit a reasonable jury to conclude that defendant's justification for its disparate treatment of plaintiff was a mere pretext for discrimination, as shown by the following analysis.

First, the largest benefit offered to McAward and Kuzmin was a substantial severance option, equal to two years' salary. Defendant claimed that these attractive severance offers had to be made to McAward and Kuzmin as an inducement to

surrender rights guaranteed under their existing service agreements, which likewise promised them two years of severance pay. Because plaintiff had no such written agreement, defendant argued, there was no reason to make him an equally attractive new offer as inducement to relinquish these rights. Serious doubt was cast upon defendant's justification at trial, however, when plaintiff presented evidence that he, too, was guaranteed a significant severance package upon his retirement (equal to twenty months of salary), promised not through a service agreement, but through a "tin parachute" program adopted by Ultramar PLC in July 1991. Trial Transcript at 425. Yet, pursuant to plaintiff's job offer to relocate, he was also asked to surrender his severance package, even though the new offer entitled him to less than one year's severance pay at the end of his two years of employment with defendant (far less than the twenty months of severance pay he was expected to surrender). In contrast, McAward and Kuzmin were offered twenty-four months of severance pay, equal to what they were required to give up, even if they left the corporation after eighteen months. Simply put, there was sufficient evidence before the jury that defendant's explanation for the disparate severance package offered to plaintiff was pretextual, since he was being asked to surrender rights largely equivalent to those given up by his younger counterparts in exchange for substantially lesser compensating benefits.

Similarly, defendant attempted to justify its decision to offer only McAward and Kuzmin restricted stock in the new corporation on the basis that it had to offer them this perquisite in exchange for surrendering their rights under their written service agreements. However, in an attempt to show that this justification was pretextual, plaintiff adduced Kuzmin's testimony that he was never told of any link

**2.** Defendant's objection to the admission of Plaintiff's Exhibits 58 and 6 at trial will be discussed more fully hereinafter.

between the restricted stock and the surrender of benefits under his service agreement. Trial Transcript at 81, 143, 147. Moreover, there was testimony that the restricted stock offer was referred to as a "sign-on" bonus to those agreeing to work for the newly formed company, thus belying the contention that this perquisite was intended to be inducement for relinquishing prior entitlements. *Id.* at 730–31, 428–29.

In the same way, plaintiff presented sufficient evidence that defendant's explanation for why plaintiff was not offered stock options and participation in the company's bonus plan was pretextual. While defendant argued that in its negotiations with plaintiff, it had simply "never reached the point" where these benefits were discussed, Defendant's Reply Memorandum of Law at 6–7, the jury was entitled to discredit this justification. This is especially true since plaintiff specifically confronted his superiors about the inequality of his offer, at which time, it would be reasonable to expect that if plaintiff's superiors had intended to give him many of the same benefits promised to others, they would have told him so; but they did not. Trial Transcript at 734–43.

Defendant took a different tack in explaining plaintiff's contention that his offer was intended to be a two-year, non-renewable offer of employment, whereas McAward's and Kuzmin's offers clearly had potential for renewability. On this point, defendant attempted to argue, through the testimony of Patrick Guarino, General Counsel for both Lasmo and Ultramar Corporation, that plaintiff's term of employment might be more than merely a two-year position. *Id.* at 277–78. This testimony, however, was severely undercut by Guarino's deposition testimony admission that plaintiff had been offered only temporary employment: " . . . . [W]hat he was being asked to go up there and do was a short-term transition. It wasn't long-term. It wasn't going to be permanent employment, and there was no spot to give

him other than that spot afterwards." *Id.* at 287–88. There was also testimony that, during this two-year period, plaintiff was expected to train his successor, who would replace him when he left. *Id.* at 722. Thus, there was evidence from which a reasonable jury could conclude that defendant's rationale for offering only temporary employment was a mere pretext for discrimination.

Finally, defendant never fully explained why both McAward and Kuzmin were offered raises in their annual salary, while plaintiff was offered a lower salary for Montreal than he had earned in Tarrytown. Defendant's vague assertion that plaintiff's salary was not being increased because salaries "had to be maintained within the salary structure," Defendant's Reply Memorandum of Law at 7, does not explain why McAward and Kuzmin were offered raises while plaintiff was not. There was clearly sufficient evidence for a jury to conclude that this explanation was pretextual, from which the jurors were entitled to infer that discrimination had occurred. .

In sum, we cannot say that the jury's determination was so unreasonable that defendant is entitled to judgment as a matter of law. Even under the less stringent standard for granting a new trial, defendant's motion must fail. After independently weighing the evidence, as Rule 59 requires, we conclude that many of defendant's offered "non-discriminatory" reasons for its admittedly disparate treatment of plaintiff were unconvincing, and that this evidence was sufficient to support a reasonable inference that defendant's real motivation was age-based discrimination. *St. Mary's Honor Ctr.,* 509 U.S. at 511, 113 S.Ct. 2742. Plaintiff was asked to surrender benefits essentially equivalent to those surrendered by the two younger vice-presidents in exchange for future benefits significantly less than those offered to them.

## C. Defendant's Claim That Plaintiff Acted Unreasonably in Rejecting the Job Offer Made to Him

■ Defendant's argument that plaintiff acted unreasonably in rejecting defendant's job offer requires little discussion, since it represents a misapplication of Supreme Court precedent. In *Ford Motor Co. v. EEOC*, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), the Supreme Court ruled that when a plaintiff claims that his or her termination was the result of discrimination, and the defendant company makes an unconditional offer to re-hire that plaintiff, all back pay liability should be tolled upon the rejection of that offer. The Supreme Court explained that this rule is designed "to encourage ... defendants promptly to make curative, unconditional job offers to .... claimants, thereby bringing defendants into voluntary compliance and ending discrimination far more quickly than could litigation proceeding at its often ponderous pace." *Id.* at 228, 102 S.Ct. 3057 (internal quotations omitted).

In the present case, defendant argues that because the job offered plaintiff was commensurate with what he was earning before, he is entitled to zero back pay, even if the offer was the product of federally prohibited discrimination. But, as previously discussed, after factoring in severance pay, the job offer made to plaintiff was not even equivalent to what he was earning before, much less to the offers made to younger vice-presidents. Moreover, even if the offer was equivalent, the instant action is nothing like *Ford*, where the defendant had allegedly discriminated against a plaintiff in terminating her and, having been made aware of this claimed discrimination by the filing of a lawsuit, offered to rectify any wrong by re-hiring her. Here, by contrast, the allegedly discriminatory job offer was the very basis of the lawsuit, rather than being made in a good-faith effort to settle an existing lawsuit by coming into "voluntary compliance" with the federal discrimination laws. *Ford* seeks to reward defendants who promptly act to cure past wrongs of discrimination, not to penalize plaintiffs by requiring them to accept discriminatory job offers.[3]

Of course, *Ford* does require that plaintiff's rejection of defendant's job offer must be reasonable. Here, plaintiff was asked to relinquish his entitlement to a lump sum severance payment of $283,000, force his wife to give up her job and relocate to Canada, in exchange for a job at a lower annual salary than he was making, with a severance package less desirable than that he was already entitled to, and a clear indication that the position was only temporary. A reasonable jury could find that plaintiff made a rational choice when he decided to reject the offer, keep the severance pay to which he was already entitled, and seek comparable employment in the United States.

## D. Plaintiff's Alleged Failure to Mitigate Damages

■ All parties agree that the plaintiff's duty to mitigate "is not onerous, and does not require him to be successful in mitigation." *Dailey v. Societe Generale*, 108 F.3d 451, 456 (2d Cir.1997) (internal

---

**3.** Admittedly, *Ford* can be read more broadly, to extend beyond offers of reinstatement made by the employer responsible for the alleged discrimination. *See NLRB v. F.E. Hazard, Ltd.*, 959 F.2d 407 (2d Cir.1992). For example, an employee would be required to accept a job offer made even by a different employer if that offer was "substantially similar" to the job defendant was previously denied. Yet, this again involves a case where the new offer "wipes away the discrimination," i.e., if the plaintiff was fired from a job paying $50,000/year because of discrimination, a plaintiff cannot receive back pay if he rejected an offer of employment to do the same kind of work for $50,000. Here, however, defendant's claim that plaintiff was required to accept their offer of employment is inapposite, since this offer does not ameliorate the effects of the discrimination. To the contrary, it is this very offer that plaintiff alleges was discriminatory, and defendant is not insulated from any liability merely because the offer, though discriminatory, would have provided benefits approaching those which plaintiff was theretofore receiving.

quotations omitted). It is also clear that the plaintiff need not accept employment that is "not comparable to his previous position," *Clarke v. Frank*, 960 F.2d 1146, 1152 (2d Cir.1992), nor "go into another line of work, accept a demotion, or take a demeaning position." *Ford*, 458 U.S. at 231, 102 S.Ct. 3057. Defendant here argues that plaintiff made no reasonable effort to find comparable employment. *See, e.g., Greenway*, 143 F.3d 47.

In this case, there was evidence at trial that, after plaintiff left his job, he made use of the out-placement services made available to him by UEL and complied with their suggestions. Trial Transcript at 765–66. Plaintiff also testified that he attempted to pursue various leads and contacts, making approximately fifty calls to those in the oil trading business to make them aware that he was looking for work. *Id.* at 767. Plaintiff also testified that he spoke to law firms to offer his services as a consultant and he did, in fact, receive discrete, temporary consulting jobs as a result. *Id.* at 768–69, 772. Plaintiff also responded to announcements advertising positions in the oil industry, *id.* at 770, and wrote letters seeking employment over the period from 1993 to 1995. Pl.Ex. 72.[4]

The jury was properly charged as to plaintiff's obligation to mitigate his damages by using reasonable efforts to find comparable work. We cannot say that, on the evidence presented, no reasonable jury could have found that plaintiff's efforts satisfied that obligation. The jury, of course, had to consider the evidence as to plaintiff's age, type of employment, and work experience. *See Rasimas v. Michigan Dept. of Mental Health*, 714 F.2d 614, 624 (6th Cir.1983). Plaintiff is a high school graduate with no advanced education other than specialized experience in the oil industry. At the time he left his job, plaintiff was fifty-nine years old and had been employed for over thirty years

exclusively in the oil industry. Plaintiff's skills were highly specialized, in a field with limited employment options; it is not at all implausible that, despite reasonable efforts, he was unable to find comparable work.

E. *Defendant's Claim That Plaintiff Filed his Charge With the EEOC More Than 300 Days After the Cause of Action Accrued*

■ As a threshold matter, we wonder why, after submitting a lengthy summary judgment motion decided by this Court, defendant now raises this claim for the first time five years after this litigation was commenced. Perhaps because it was not until the trial that defendant hit upon the rationalization that plaintiff was given a different job offer than the other vice-presidents because he, unlike them, did not have a written employment contract. Thus, defendant contends, the cause of action accrued when plaintiff was hired without being offered a service agreement, much more than 300 days before plaintiff filed his complaint with the EEOC, so that plaintiff's ADEA claims are time-barred. *See, e.g., Hodge v. New York College of Podiatric Medicine*, 157 F.3d 164, 166 (2d Cir.1998).

This argument must fail for the reasons explained in the foregoing discussion of the sufficiency of the evidence of discrimination. As previously explained, plaintiff presented sufficient evidence that a reasonable jury could find that defendant's attempted justification of the disparate job offer made to plaintiff on the basis that plaintiff did not have a service agreement was a mere pretext for discrimination. Plaintiff's cause of action accrued at the time the disparate job offer was made, not a year earlier when defendant's claimed basis of justification for the disparity arose. Moreover, even if the plaintiff had filed an EEOC complaint at this time, this

---

**4.** Thus, defendant's contention that there is "absolutely no support in the record" that the plaintiff attempted to mitigate his damages after an initial six-month search is simply untrue. Defendant's Reply Memorandum of Law at 16.

complaint would have been against his then employer, UEL, and not against defendant Ultramar Corporation, which did not even exist at that time.

## II. *Defendant's New Trial Claims Based on Purported Errors at Trial*

### A. *Standard of Review*

Defendant in this motion has not only focused on the sufficiency of evidence in seeking to vacate the verdict, but has also raised supposed errors at trial to justify the granting of a new trial pursuant to Rule 59. Of course, a court may grant a new trial if substantial errors were made in admitting or excluding evidence, or in charging the jury, or in misconduct, or because a material issue was improperly submitted or withdrawn from a jury. *See* Fed.R.Civ.P. 59; 12 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 59.13 (3d ed.1998). This list is not exhaustive, as a trial court may order a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed.R.Civ.P. 59. Despite this great latitude, it is well settled that the trial judge is to "abstain from interfering with the verdict unless" upholding it would constitute a "miscarriage of justice." *Bevevino,* 574 F.2d at 684. The federal rules direct the court to "disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Fed.R.Civ.P. 61.

### B. *Defendant's Claim that it is Entitled to New Trial Because the Court Erred in Instructing the Jury on the McDonnell Douglas Burden–Shifting Analysis*

Relying on dictum in *Greenway,* 143 F.3d 47, to the effect that it is prefera-

ble for the trial judge to not instruct the jury on the *McDonnell Douglas* test, defendant contends that such instruction by the Court, while a completely accurate recitation of the law in this circuit, still constitutes such grave error as to entitle them to a new trial. This Court is not persuaded.

First, defendant has directed the court to no cases, and we are not aware of any, that have granted a new trial based on such a claim.[5] Further, *Greenway* involves a case where the *McDonnell Douglas* burden-shifting analysis was not only discussed in the charge but also specifically delineated in the jury verdict form, and *Greenway* is clearly focused on the confusion created by asking a jury to give a separate "yes" or "no" answer as to each of the three phases of the burden-shifting analysis. *Id.* at 52. In contrast, in the instant case, the *McDonnell Douglas* framework was only presented to the jury during jury instruction, but the jury verdict form dispensed with the "ping-pong-like" match of shifting burdens and presented the jury with exactly the kind of determination suggested by *Greenway. Id.* Specifically, the form simply asked the jury, "Do you find that the defendant Ultramar Corporation discriminated against plaintiff on the basis of his age in connection with the job offer to relocate to Montreal in June 1992?" *See* Jury Verdict Form, Question (1)(B).

Third, we note that even if the *McDonnell Douglas* instruction was given in error, defendant must show that the error was so grievous that it would constitute a "miscarriage of justice" to not order a new trial. *Bevevino,* 574 F.2d at 684. In this regard, we note that numerous courts, including the *Greenway* court, have emphasized that the first two steps of *McDonnell*

---

5. To the contrary is *Cabrera v. Jakabovitz,* 24 F.3d 372 (2d Cir.1994), where not only was the jury instructed on *McDonnell Douglas,* but the judge inaccurately explained it, and the Second Circuit still upheld the jury's verdict. Also relevant is *Messina v. Kroblin Transp. Sys., Inc.,* 903 F.2d 1306, 1309 (10th Cir.

1990), in which the court, while expressing "misgivings" about instructing the jury on the *McDonnell Douglas* analysis, upheld the verdict because the instruction still "directed the jury's attention to the ultimate question—was age a determinative factor in [plaintiff's] discharge." *Id.*

*Douglas* are exceedingly easy to satisfy. *Greenway,* 143 F.3d 47; *Viola,* 42 F.3d 712. Indeed, at least one court has commented that a recitation of the *McDonnell Douglas* analysis, if it prejudices anyone, actually prejudices the plaintiff, since it "at worst .... present[s] the plaintiff with an additional obstacle, the possibility that the jury would find for the defendants on the basis that the plaintiff failed to make out a prima facie case." *Bruno v. W.B. Saunders Co.,* 882 F.2d 760, 768 (3rd Cir.1989). Defendant makes much of the fact that the jury reached a verdict shortly after requesting testimony concerning "the relationship between stock options and having or not having a service agreement." Court's Ex. 7. Somewhat cryptically, defendant argues that because the jury shortly thereafter entered a verdict for plaintiff, this demonstrates that the jurors erroneously believed that they "had to determine whether Ultramar met an evidentiary burden, when the sole burden at that point rested with the plaintiff." Defendant's Memorandum of Law at 22. The Court is baffled as to how this request from the jury, followed shortly thereafter by a verdict for plaintiff, could show that the jury erroneously shifted the burden of proof.

More probably, it indicates that the jury was struggling with the question of whether the existence of pre-existing written agreements with the other Tarrytown vice-presidents, which was the reason given throughout trial by defendant for the disparate job offer to plaintiff, was actually a pretextual justification advanced by the defendant for the disparate job offer, and whether it could infer an intent to discriminate from this failed justification. Such an analysis, to state the obvious, is exactly what the law requires, and shows that the jury was accurately applying the law. In conclusion, the Court rejects defendant's claim with some bewilderment: defendant

seems to contend that accurately instructing the jury on the applicable law in this jurisdiction constitutes such grievous error that a new trial is required.

## C. *Defendant's Claim That it is Entitled to New Trial Because of the Admission of Exhibits 58 and 6 at Trial*

 As a threshold matter, we note that defendant never objected to the admission of Exhibit 6, Trial Transcript at 75, and thus a new trial is warranted on this claim only if its admission was plain error, meaning that the error must "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States,* 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (internal quotations omitted). Moreover, while defendant did object to the admission of Exhibit 58, defendant did not object to the admission of Kuzmin's service agreement, Pl.Ex. 100, *see* Trial Transcript at 59–60, which is identical in all relevant aspects to McAward's service agreement and contains the same disputed clause.[6] Even if defendant's objection to Exhibit 58 is sufficient to preclude application of the plain error standard, we hold that even applying a less stringent standard to both Exhibit 58 and 6, defendant's motion must fail.

### 1. *Plaintiff's Exhibit 58*

 Defendant argues that it is entitled to a new trial because the Court wrongly admitted into evidence McAward's service agreement, which provides that certain benefits afforded McAward in the agreement "shall not be extended beyond the Employee's attainment of age sixty-five." Plaintiff understandably seized upon this provision as evidence that defendant Lasmo and Ultramar intended to dis-

---

**6.** Although Ultramar Corporation's co-defendant at trial, Lasmo, did object to Exhibit 100, we doubt defendant intends to argue that this objection represented its interests as well, since Ultramar's entire claim of error is based on the theory that it is wholly distinct from Lasmo.

criminate against plaintiff on the basis of age.

Citing *Gadsby v. Norwalk Furniture Corp.*, 71 F.3d 1324, 1330 (7th Cir.1995), defendant first argues that because this agreement involved McAward, it cannot be admitted to prove intent to discriminate against plaintiff, who did not have such an agreement. This Court does not agree. It seems obvious that evidence that the predecessor of plaintiff's employer has disfavored continuing the employment of another employee beyond a certain age is relevant as increasing the likelihood that the employer has similarly discriminated against the plaintiff. *See* Fed.R.Evid. 401. This seems especially true in view of the oft-repeated judicial recognition of the difficulty plaintiffs face in proving an employer's intent to discriminate. *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 464 (2d Cir.1989) ("employers are rarely so cooperative as to include a notation in the personnel file that their actions are motivated by factors expressly forbidden by law") (internal quotations omitted); *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1112 (2d Cir.1988) ("direct evidence of discrimination is difficult to find precisely because its practitioners deliberately try to hide it. Employers of a mind to act contrary to law seldom note such a motive in their employee's personnel dossier"). We cannot understand defendant's argument that employment contracts specifically providing that certain benefits described therein do not apply to employees over age sixty-five have no probative value in determining whether the employer intended to discriminate between its employees on the basis of age.

Further, defendant argues that these contracts are not relevant because they are not technically agreements of the defendant Ultramar Corporation. More specifically, they are service contracts utilized by American Ultramar Limited ("AUL"), a subsidiary of Ultramar PLC which was taken over by Lasmo in a hostile takeover; after this takeover, Lasmo then created defendant Ultramar Corporation. However, Lasmo and Ultramar Corporation were not so distinct. Patrick Guarino, while serving as a General Counsel for both Ultramar and Lasmo, made plaintiff the job offer on behalf of Ultramar Corporation while sitting in his Lasmo office. He further testified that he had utilized these service agreements while serving as General Counsel of AUL. Trial Transcript at 413–14. We will not hold that merely because the agreements were made by AUL, which was subsequently bought by Lasmo, it cannot be used as evidence of discrimination against a Lasmo spin-off, Ultramar Corporation.

We also note that while, in this context, Ultramar has stressed that the company has "nothing to do" with service agreements made at AUL, in other contexts Ultramar has stressed the close relation between Ultramar and AUL/Lasmo. For example, when plaintiff originally brought his complaint to the EEOC, Ultramar was content to sit back and delegate to Lasmo the defense of those charges before the EEOC, with Ultramar bearing all costs and expenses. Similarly, in the same posttrial brief claiming that it was error to admit the Lasmo/AUL service agreements because Ultramar had "nothing to do" with them, Ultramar argues a different legal point by stressing the complete identity of interest of Ultramar and Lasmo. More specifically, in explaining why Ultramar failed to object to the disputed *McDonnell Douglas* jury charge it now claims was made in error, Ultramar argues that Lasmo's objection was sufficient to protect Ultramar's interests, because the two companies "were joined in interest on their objections." Ultramar's Reply Memorandum of Law at 17. Although such claims of common interest would fall short of establishing that the two corporations should be considered as one for all legal purposes, there was clearly a sufficient relationship between them that a document prepared by one of them could be

relevant to a jury in drawing conclusions about the intent of the other.

Finally, we cannot resist remarking on the stunning irony that defendant's principal defense at trial was that it was these same Lasmo service agreements which impelled it to make McAward and Kuzmin more favorable employment offers in order to induce them to relinquish the rights that Ultramar was obligated to honor under those agreements. It is difficult to understand how Ultramar could be "entitled to a new trial because the judge erred in admitting [these agreements]," Defendant's Memorandum of Law at 24, when Ultramar itself based its principal defense on these agreements.

Nor can Ultramar be heard to argue that while these documents should have been admitted, the jury should have been instructed that they could not use these documents in considering whether Ultramar discriminated, because Ultramar made no request for such a charge to the jury at trial. Moreover, even if, on retrial, the documents were admitted with such a limiting instruction, there would be no assurance that the jury could actually perform the "mental gymnastics" of compartmentalizing its consideration of the exhibits to the specific purpose for which Ultramar seeks them to be used. *See United States v. De Sisto*, 329 F.2d 929, 933 (2d Cir.1964).

### 2. *Plaintiff's Exhibit 6*

■ We are even more perplexed by defendant's argument that Exhibit 6 should not have been admitted at trial, since it is undisputed that this document was produced by defendant and not Lasmo. Exhibit 6 was a document prepared by defendant's human resources department that included the age of sixty as a suggested retirement age for Ultramar employees. Ultramar argued at trial that this age was a mere random selection chosen by the human resources department in an effort to demonstrate how projected benefits were calculated, whereas plaintiff argued that the particular age selected reflected the company's age bias. The document is certainly open to both interpretations, and it was up to the jury to choose between them. The only proper questions concerning its admissibility at trial are whether its tendency to unfair prejudice outweighs its probative value. *See* Fed.R.Evid. 403. Every document that is relevant—that is, one which tends to make a fact in issue more or less probable—is by definition prejudicial to the litigation interest of one party, but that does not make it unfairly prejudicial. The Court is still convinced that in a case involving alleged age discrimination against an employee only months short of age sixty, a document prepared by defendant assuming an illustrative retirement age of sixty could be considered by the fact finder in determining whether plaintiff's age was a factor which influenced defendant in its decision to offer plaintiff less favorable employment terms than those tendered to younger officers.

### D. *Defendant's Claim That it is Entitled to a New Trial Because the Judge Impermissibly Interfered with the Deliberative Process of the Jury*

■ During the jury's deliberations in this trial, the jury foreperson sent a note into the courtroom asking, "Is there testimony that discusses this—What is the relationship between stock options and having or not having a service agreement?" Court's Ex. 7. Although the question was ambiguous, the Court, after questioning the jurors, determined that they were interested in re-hearing testimony as to whether possessing a service agreement was a necessary prerequisite to an offer of stock options as part of the consideration for relocation to Montreal. The court reporter accordingly read testimony that all parties, including defendant, agreed was relevant to that question, specifically including the testimony of Jean Gaulin, the former Chairman of AUL, stating that there was no such connection between a

service agreement and eligibility for an offer of stock options. Trial Transcript at 1170–72. The Court also re-read testimony by plaintiff, in which he stated that he had received stock options while working in Tarrytown. *Id.* at 1182. Defendant now claims that the trial court committed error by failing also to re-read to the jury other testimony by plaintiff, in which he speculated that if the new company forming in Montreal became financially stronger, and if it then chose to implement a stock option plan, he would be surprised if he was not allowed to participate in such a plan. *Id.* at 880–882.

In the first place, this testimony was not really responsive to the jury's request because it was mere speculation concerning what plaintiff might expect to happen in the future under certain conditions. Moreover, the testimony which was read adequately conveyed the concept which defendant obviously wished to be imparted to the jury—that a service agreement was not a prerequisite to an offer of stock options. The Court specifically re-read Gaulin's testimony, stating that stock options were available to those lacking a service agreement. *Id.* at 1182–84. More importantly, the Court re-read those portions of plaintiff's testimony in which he explained that, even without a service agreement, he received stock options while working at Tarrytown. *Id.*

Further, we cannot fail to notice that this contention, like others defendant has made, is inconsistent with its position throughout the trial. Defendant there contended that the reason for its less favorable offer to plaintiff was that he lacked a service agreement, whereas it had to offer those employees who had a service agreement a more favorable deal to entice them to relinquish the benefits accorded by those agreements. Plaintiff's testimony which was not read back to the jury suggests that he would ultimately expect to receive stock options even though he did not possess a service agreement. This testimony would thus have seriously undercut defendant's principal defense.

Finally, we note that the two cases cited by defendant in support of this claim of error are totally inapposite. In *United States v. Lee*, 532 F.2d 911 (3rd Cir.1976), the court addressed the unrelated question of whether a judge may question individual jurors while polling the jury as to their motivation for finding a defendant guilty. Similarly, in *United States v. Sealander*, 91 F.3d 160, 1996 WL 408368 (10th Cir. 1996), an unpublished opinion, the court found that the judge's decision to give a variation of the *Allen* charge in order to encourage a deadlocked jury to reach a unanimous verdict did not necessitate a new trial. Defendant here has inexplicably cited these cases in support of the proposition that a judge's attempt to clarify the meaning of an ambiguous note by questioning the jury collectively in open court "interfered with the deliberative process of the jury." Defendant's Memorandum of Law at 28. It is well-established that such questioning is permissible, and is clearly preferable to merely guessing at the meaning of an ambiguous jury request, at the risk of providing the jury with information they did not request. *See, e.g., United States v. Ulloa*, 882 F.2d 41 (2d Cir.1989). In fact, colloquy with jurors has been permitted in instances far more disruptive to the jury's "deliberative process" than that conducted in the instant case. *See, e.g., Resolution Trust Corp. v. Stone*, 998 F.2d 1534 (10th Cir.1993) (questioning the jury to confirm the accuracy of its verdict is appropriate); *Attridge v. Cencorp Div. of Dover Tech. Int'l, Inc.*, 836 F.2d 113 (2d Cir.1987) (same).

## CONCLUSION

For the reasons stated above, defendant Ultramar Corporation's motion to vacate the verdict and enter judgment for the defendant pursuant to Fed.R.Civ.P. 50(b)

or, in the alternative, to order a new trial under Fed.R.Civ.P. 59(a), is denied.

SO ORDERED.