David L. CARMODY, Plaintiff,

v.

**PRONAV SHIP MANAGEMENT, INC., Defendant.**

No. 02 CIV. 7158(DF).

United States District Court,
S.D. New York.

Aug. 17, 2004.

Joseph Stearns, Esq., Noreen D. Arralde, Esq., Kenny, Stearns & Zonghetti, New York.

## MEMORANDUM AND ORDER

FREEMAN, United States Magistrate Judge.

This case, before me on consent pursuant to 28 U.S.C. § 636(c), was brought under the Jones Act, 46 U.S.C.App. § 688, and general maritime law by David L. Carmody, who, in August 2000, became severely ill while serving as Chief Engineer on a large tanker ship, *en route* from Japan to Indonesia. Mr. Carmody's illness progressed to coma and extended critical illness, and, although he has now largely recovered, he endured a difficult and painful recovery period and still suffers residual effects of his illness.

In this action, Mr. Carmody claimed, *inter alia,* that the ship's operator, ProNav Ship Management, Inc. ("ProNav"), was negligent in failing to provide him with reasonable medical care on board ship, once he started to show signs of illness. The case was tried to a jury from February 23 to March 8, 2004, and resulted in a verdict in Mr. Carmody's favor on his claim of negligence under the Jones Act.[1] The Court entered judgment on March 22, 2004. By timely motion, defendant ProNav now seeks a new trial, under Federal Rule of Civil Procedure 59, on the grounds that (1) certain of the Court's evidentiary rulings were in error, and (2) the verdict is against the weight of the evidence. For the reasons set forth below, ProNav's motion for a new trial is denied.

## BACKGROUND

The evidence presented at trial is set forth and discussed more fully below, in relevant sections of this Memorandum and Order. It is worth noting at the outset, however, that, both at trial and now in its post-trial motion, ProNav has given scant attention to the question of whether the ship's chief medical officer acted negligently in failing even to make a telephone call to on-shore medical

John P. James, Esq., Friedman & James, L.L.P., New York City, for plaintiff.

Noreen D. Arralde, Kenny, Stearns & Zonghetti, New York City, for defendant.

---

1. The Court also submitted Mr. Carmody's claim of "unseaworthiness" to the jury, but the jury rejected that claim.

personnel (as apparently required by Pro-Nav's own operations manual), to try to determine whether any means were available to assist a gravely ill seaman. Throughout the trial, as here, ProNav's counsel has instead focused primarily on the issue of causation, *i.e.*, whether any negligent act or omission by ProNav caused Mr. Carmody's injuries. In connection with its arguments on causation, ProNav has repeatedly asserted that, at the time he commenced this action, Mr. Carmody did not have a clear picture of what triggered the onset of his critical illness, and that he thus commenced the action in bad faith.

According to ProNav, Mr. Carmody originally had no idea as to what underlying medical condition or infection made him become ill. Indeed, ProNav argued that Mr. Carmody could not have known the answer to that question, because, as ProNav's medical expert testified at trial, "no one" could have known the answer based on the available medical information. Throughout trial, particularly during side-bar conferences, ProNav's counsel argued strenuously that Mr. Carmody's counsel, Michael Savasuk, Esq., upon being retained in the case, concocted a theory as to what caused Mr. Carmody's illness (*i.e.*, that Mr. Carmody became ill because of an untreated onset of diabetes), and then persuaded an expert endocrinologist, Dr. Stephen Babirak, to adopt that theory without support or justification.

In pressing this argument as its overarching theory of the case, ProNav attempted to introduce at trial any evidence tending to suggest that Mr. Carmody's trial testimony regarding his initial symptoms of illness and his understanding of the cause of his illness differed from his earlier statements on the same subjects and was at odds with the medical evidence. Similarly, in the seeming belief that Mrs. Carmody was in league with her husband in perpetrating a fraud on the Court, ProNav tried to demonstrate that Mrs. Carmody's trial testimony as to her understanding of what caused her husband's illness was contrary to her prior statements on that question, and was in conflict with medical evidence of which, according to Pro-Nav, she must have had knowledge. Further, ProNav sought to demonstrate that neither the Carmodys nor their counsel had provided Dr. Babirak with sufficient, candid information for him to develop a reasoned opinion on causation, or that, alternatively, Dr. Babirak was willing to ignore such information so as to conform his opinion to the Carmodys' litigation strategy.

In its motion for a new trial, ProNav argues that the Court erred in excluding evidence that would have been probative on the causation issue, and further argues that the Court's evidentiary rulings tied the hands of ProNav's counsel in terms of counsel's ability to cross-examine the Carmodys or Dr. Babirak effectively.[2] The evidentiary rulings challenged by ProNav fall into the following categories: (1) the Court's exclusion of certain statements, whether written or oral, of doctors who treated Mr. Carmody in Indonesia or Singapore, (2) the exclusion of certain testimony of Dr. Thomas Kinkead, a urologist who treated Mr. Carmody upon his re-

---

**2.** As a backdrop to this argument, ProNav repeatedly notes that the Court charged the jury that, in a Jones Act case, the plaintiff was only required to prove that the defendant's negligence played "any part, even the slightest" in bringing about the plaintiff's injury. This was a proper jury instruction, *see, e.g., Ferguson v. Moore–McCormack,* 352 U.S. 521, 523, 77 S.Ct. 457, 1 L.Ed.2d 511 (1957); *Warren v. Keystone Shipping Co.,* 95 Civ. 08125 (BSJ), 2000 WL 145117 (S.D.N.Y. Feb. 3, 2000) ("[I]n a Jones Act case ... the jury is required to find ... only that the defendant was negligent and that such negligence played a part, *no matter how slight,* in bringing about injury to the plaintiff." (emphasis in original)); *see also* 5 L. Sand, *et al., Modern Federal Jury Instructions* 90–25 (2002) (proposing "did such negligence play any part, even the slightest, in bringing about an injury to the plain-

tiff" as an instruction for a Jones Act claim), and ProNav does not seriously contend otherwise. Rather, ProNav appears to argue that, given the existence of a lenient negligence standard that benefited the plaintiff, the Court was required to bend over backwards to make sure that the defendant had every conceivable opportunity to present evidence relevant to the causation issue. (*See* Memorandum of Law, filed April 14, 2004 ("Def.Mem.") (Dkt.37), at 3–4.) ProNav cannot plausibly argue, however, that the governing negligence standard should have altered the Federal Rules of Evidence regarding the admissibility of testimony or documentary exhibits. The reality is that any argument that the Court erred as to evidentiary rulings must be resolved by application of pertinent evidentiary principles, and those are the principles discussed herein.

turn to the United States, and (3) the exclusion of ProNav's proffered testimony of an expert urologist, Dr. Christopher Kelly.

None of ProNav's arguments, however, accurately depict either the Court's evidentiary rulings or its justification for the rulings that it did make. For example, as discussed further below, ProNav appears to challenge the Court's pre-trial exclusion of at least one exhibit that the Court, during trial, actually received in evidence, without limitation. As to a second exhibit, the Court specifically afforded counsel an opportunity to use the document at trial during cross-examination of plaintiff's medical expert, and counsel declined the opportunity. As to other exhibits, ProNav is belatedly raising arguments never raised to the Court during trial. And, as to the Court's rulings regarding the testimony of Drs. Kinkead and Kelly, ProNav has now entirely rewritten history, losing sight completely of the positions it actually took at the time the Court's rulings were made.

Finally, ProNav argues that the jury's verdict in plaintiff's favor was against the weight of the evidence. Yet as discussed herein, the verdict was well supported by the evidence, both with respect to liability and damages.

## DISCUSSION

### I. EVIDENTIARY RULINGS

#### A. Statements of Doctors Who Treated Mr. Carmody in Indonesia and Singapore

■ Prior to the commencement of trial, it became clear that neither party had made any effort, during the discovery process, to utilize the Hague Convention to obtain the testimony or records of any physician who had treated Mr. Carmody immediately after he was taken off the ship in Indonesia or once he was transported for further medical care to a hospital in Singapore. Although Mr. Carmody's counsel had contacted at least some of these doctors directly, they mostly responded by writing letters (either to counsel or to Mr. Carmody's family physician in Maine, Dr. Benedict Farino) that purported to summarize their findings informally and after the fact, and they did not attach any contemporaneous records of Mr. Carmody's hospitalization or treatment. At the time of trial, the only available, contemporaneous medical records of Mr. Carmody's condition and treatment in either Indonesia or Singapore consisted of an August 29, 2000 report, prepared by Dr. H. Tunjung of the P.T. Badak Clinic in Bontang, Indonesia (Pl.Ex. 20), the August 29, 2000 results of certain laboratory tests performed on Mr. Carmody while he was at that clinic (Def.Ex. Z), and a laboratory report from Mount Elizabeth Hospital in Singapore, containing results of tests on blood and other fluid samples collected from Mr. Carmody between August 30 to October 2, 2000 (Pl.Ex. 6). None of the doctors from either Indonesia or Singapore testified at deposition or were called at trial.

On plaintiff's pre-trial motion *in limine* to exclude certain doctors' statements as hearsay, the Court examined the documents that had been obtained by counsel and determined that, although Dr. Tunjung's contemporaneous report and the laboratory test results from both Indonesia and Singapore were inherently reliable and would be admitted, the non-contemporaneous letters from the doctors in Singapore were inherently unreliable and would be excluded. In its post-trial motion, ProNav appears to complain about this pre-trial ruling with respect to two letters from Singapore doctors: (1) an undated letter from Dr. Pwee Hock Swee to Dr. Farino (marked as Plaintiff's Exhibit 7), and (2) a letter dated May 8, 2002, from Dr. Gwee Hak Meng to plaintiff's counsel (marked as Plaintiff's Exhibit 8).[3] (*See* Def. Mem. at 3; Affidavit of Joseph T. Stearns, sworn to April 14, 2004 ("Stearns Aff.") (Dkt.36),[4] at ¶ 4.)

---

3. Although these exhibits were listed as *plaintiffs'* exhibits in the parties' Joint Pretrial Order, plaintiff's counsel explained that it was his understanding that each party needed to list all exhibits that it might wish to use at trial, even in cross-examination, and that plaintiff would otherwise object to the admissibility of these particular exhibits on hearsay grounds. Ultimately, it was defendant that sought to introduce these exhibits at trial, over plaintiff's objection.

4. Plaintiff made a motion to strike Mr. Stearns's April 14, 2004 affidavit (*see* Notice of Motion to Strike the Affidavit of Joseph T. Stearns, filed May 11, 2004 (Dkt.54)), as being improperly argumentative and lacking proper citations to the

ProNav makes this argument despite the fact that, at trial, the Court actually received Plaintiff's Exhibit 7 in evidence, and also provided ProNav with a full opportunity to use Plaintiff's Exhibit 8 to cross-examine plaintiff's medical expert, although ProNav chose not to do so.

ProNav also argues that, at trial, the Court erred in excluding evidence of two statements purportedly made by Dr. Tunjung to Mr. Carmody's sister, Liz Lemiska. ProNav makes this argument even though there was no evidence offered to the Court that Dr. Tunjung was even the declarant of the first statement, and even though ProNav never offered the Court any basis for admission of the second statement.

### 1. *Letters from Drs. Swee and Meng*

ProNav's objection to the Court's ruling as to Plaintiff's Exhibit 7, the letter from Dr. Swee, was rendered moot by the Court's later decision, at trial, to receive that exhibit in evidence. At trial, ProNav's counsel argued that, even if Plaintiffs' Exhibits 7 and 8 contained hearsay, counsel should nonetheless be entitled to cross-examine plaintiff's expert, Dr. Babirak, regarding the specific contents of those exhibits, because they were considered by Dr. Babirak in forming his expert opinion. (2/27/04 Tr. at 108–11.) After initially ruling that the hearsay statements in the documents could not be disclosed on cross-examination, the Court reconsidered its ruling in light of precedent cited by ProNav, and reversed its initial ruling, so as to allow the requested cross-examination, including disclosure of the documents' contents.[5]

Accordingly, on March 3, 2004, Dr. Babirak, who had otherwise completed his testimony and returned to Maine, was recalled to the stand, via live video-conferencing, and ProNav was permitted to cross-examine him in detail regarding both Plaintiff's Exhibits 7 and 8. ProNav's counsel, however, chose to focus that cross-examination solely on Plaintiff's Exhibit 7 (the Swee letter). (3/3/04 Tr. at 15, 21–29, 40.) Following Dr. Babirak's testimony, plaintiff, who had originally challenged the admissibility of Plaintiff's Exhibit 7 (*see* n. 3, *supra*), opted to offer it in evidence after all, and, under the circumstances, the exhibit was then admitted without objection and without any limitation on its use. (*See* 3/3/04 Tr. at 62.)

To the extent that ProNav is still objecting to the Court's pre-trial ruling to exclude Plaintiff's Exhibit 8 (Dr. Meng's letter) from evidence, its objection is meritless. Dr. Meng's letter consisted of hearsay and was properly excluded. Fed.R.Evid. 801–03; *Douglas v. Victor Capital Gr.*, 21 F.Supp.2d 379, 383–84, 391 (S.D.N.Y.1998) (medical evidence consisting of unsworn doctors letters is inadmissible hearsay); *Burgos v. City of Rochester*, No. 99 Civ. 6480, 2003 WL 22956907, at *3 (W.D.N.Y. Mar.31, 2003) (medical evidence which consisted of doctors' letters are "clearly inadmissible hearsay"); *see also Felice v. Long Island Railroad Co.*, 426 F.2d 192, 198 (2d Cir.1970) (a doctor's letter, which described the contents of another doctor's report, is inadmissible hearsay). But, in any event, ProNav suffered no prejudice from the Court's ruling. As noted above, the Court afforded ProNav a full opportunity to cross-examine Dr. Babirak about the contents of the Meng letter, yet ProNav

---

trial record. The Court ruled, in a telephone conference, that, while it would not strike the April 14 affidavit in its entirety, it would limit its consideration of that affidavit to factual matters properly raised therein, and would not consider legal arguments made either in that affidavit, or in Mr. Stearns' subsequently submitted affidavit of May 7, 2004.

5. Specifically, in reversing its prior ruling, the Court accepted ProNav's argument that Federal Rule of Evidence 703, while preventing the *proponent* of the expert opinion from improperly bolstering his opinion with otherwise inadmissible evidence, does not similarly prevent the *oppo-*

nent of the expert opinion from cross-examining the expert as to any material reviewed and relied upon by the expert. (*See* letter to the Court from Noreen D. Arralde, Esq., dated February 29, 2004, citing, *inter alia*, Advisory Committee's Notes to the 2000 Amendment' to Rule 703 ("Nothing in this Rule restricts the presentation of underlying expert facts and data when offered by an adverse party."); Fed.R.Evid. 705 ("The expert may in any event be required to disclose the underlying facts or data on cross-examination."); *U.S. v. A & S Council Oil Co.*, 947 F.2d 1128, 1134 (4th Cir.1991); *Ratliff v. Schiber Truck Co., Inc.*, 150 F.3d 949 (8th Cir.1998).)

chose not to take advantage of that opportunity. Further, once Dr. Swee's letter was in evidence, the Meng letter would have been merely cumulative. All of the information contained in Dr. Meng's letter regarding Mr. Carmody's condition, including his measured glucose levels in Singapore and his medical history in Indonesia, were contained in the letter from Dr. Swee, which was admitted in evidence and before the jury.

### 2. Purported Statements of Dr. Tunjung to Liz Lemiska

ProNav also argues that it was reversible error for the Court to have excluded from evidence certain deposition testimony of Liz Lemiska, Mr. Carmody's sister, as well as portions of certain exhibits marked at Ms. Lemiska's deposition. Mrs. Carmody testified at trial that she had asked Ms. Lemiska, who was a nurse, to contact Dr. Tunjung, at the P.T. Badak clinic in Bontang, Indonesia, and to speak with him regarding Mr. Carmody's condition. (3/3/04 Tr. at 125–26.)[6] At deposition, Ms. Lemiska confirmed that she did then speak with Dr. Tunjung by telephone and also communicated with him by e-mail. (See, e.g., 2/20/04 Tr. of Lemiska Dep. at 75–76, 89–91.) The Court ruled that any statements that Dr. Tunjung made to Ms. Lemiska with regard to Mr. Carmody's condition would be inadmissible hearsay, if offered for the truth of the matters asserted. (3/5/04 Conference at 2.)

#### (a) "Glucose OK"

The main issue that arose at trial with respect to Ms. Lemiska's communications with Dr. Tunjung related to a statement ("Glucose OK") contained in Ms. Lemiska's handwritten notes, which were marked as exhibits at her deposition. (See Lemiska Dep. Ex. A–1.) ProNav argued at trial that this statement must have been made to Ms. Lemiska by Dr. Tunjung in the course of Ms. Lemiska's telephone conversation with the doctor. Ms. Lemiska, however, testified at her deposition that she could not confirm

that the statement was actually made by Dr. Tunjung, and that it was in fact more probable that it was made by Mrs. Carmody, with whom she had also spoken. (2/20/04 Tr. of Lemiska Dep. at 74–75, 78–80, 88.) The statement was thus doubly unreliable, if offered for the truth as to what Dr. Tunjung had observed of Mr. Carmody's condition. Not only was the statement hearsay, but it was not even demonstrable that Dr. Tunjung was the declarant.

When asked by the Court if the statement was being offered for some purpose other than to establish the truth of its contents, ProNav's counsel argued that it was being offered to impeach the credibility of Mrs. Carmody. (3/5/04 Conference at 2–3, 7–8, 14.) Specifically, ProNav argued that it was trying to establish that Mrs. Carmody was not credible when she testified at trial that, from her communications with Mr. Carmody's doctors in Singapore, she was able to get a "clear diagnosis" of his condition, i.e., that he was in a "diabetic coma." (3/3/04 Tr. at 105.) According to ProNav, it was logical to assume that Ms. Lemiska, who had been asked by Mrs. Carmody to contact Dr. Tunjung, would have relayed back to Mrs. Carmody Dr. Tunjung's statement (further assuming that it was, in fact, Dr. Tunjung's statement) that Mr. Carmody's glucose levels, while he was in Indonesia, were "OK." From these double assumptions, counsel argued that Mrs. Carmody could not have testified truthfully that she had been able to obtain a clear diagnosis that her husband was in a diabetic coma. (3/5/04 Conference at 2–3.)

The Court excluded the statement "Glucose OK" for two reasons. First, it appeared to the Court that ProNav's argument that it was not interested in offering the statement for the truth of its contents was insincere, as one of ProNav's principal arguments at trial was that Mr. Carmody's glucose levels had not, in fact, been excessive and that his critical illness was not, therefore, caused by dia-

---

6. In its motion, ProNav argues that, by excluding portions of Ms. Lemiska's deposition testimony, the jury was never allowed to hear that Mrs. Carmody had directed Ms. Lemiska to call Dr. Tunjung. (Def. Mem. at 12.) As noted above, however, Mrs. Carmody confirmed at trial that she had indeed asked Ms. Lemiska to make the call. Thus, for whatever minimal probative value that fact may have had, the jury was made aware of it.

betes.[7] *See, e.g., United States v. Cardascia,* 951 F.2d 474, 486 (2d Cir.1991) (the trial judge must examine a proffered out-of-court statement to see whether it is being offered for the truth and, if so, whether it fits within a hearsay exception). Second, because the statement was so unreliable (as Ms. Lemiska could not even confirm the identity of the declarant), the Court reasoned that the danger of the jury being confused or misled by the statement outweighed its minimal probative value in impeaching Mrs. Carmody's credibility, and did not justify admission of the statement even with a limiting instruction. *See, e.g., United States v. Reyes,* 18 F.3d 65, 69 (2d Cir.1994) ("[W]hen the likelihood is sufficiently high that the jury will not follow the limiting instructions, but will treat the evidence as proof of the truth of the declaration, the evidence is functionally indistinguishable from hearsay.... [T]he mere identification of a relevant non-hearsay use of such evidence is insufficient to justify its admission if the jury is likely to consider the statement for the truth of what was stated with significant resultant prejudice.").

Now, in its post-trial motion, ProNav recasts its initial argument, and contends that the statement should have been admitted so as to discredit plaintiff's *expert,* Dr. Babirak. (*See* Def. Reply Mem. at 7–18.) Along these lines, ProNav now appears to argue that: (1) it should be assumed that the statement was made by Dr. Tunjung; (2) assuming the statement was made by Dr. Tunjung to Ms. Lemiska, it should further be assumed that Ms. Lemiska would have reported it to Mrs. Carmody; (3) assuming the statement was reported to Mrs. Carmody, then it was essentially made "available," through Mrs. Carmody, for consideration by Dr. Babirak, and (4) assuming the statement was, in fact, relayed to Dr. Babirak, then any failure by him to consider it before forming his expert opinion on causation would have rendered his opinion suspect. (Def. Reply Mem. at 13–18.)

As ProNav's new argument as to why the Court should have admitted the Lemiska evidence was not raised by ProNav at the time of trial and was far from obvious, the argument has been waived. *United States v. Cruz,* 894 F.2d 41, 43–44 (2d Cir.1990) ("Unless the basis for a·proposed admission is obvious, it is the burden of counsel who seeks admission to alert the Court to the legal basis for the proffer.") (quotation omitted); *see also Ramey v. District 141, Int'l Assoc. of Machinists and Aerospace Workers,* 378 F.3d 269, 281–82 (2d Cir.2004) (where defendant asserted a new argument for the admissibility of certain evidence, that it had failed to articulate at trial, this challenge to the trial judge's evidentiary ruling would not be entertained on appeal); Fed.R.Evid. 103. Moreover, ProNav's new argument is based on so many unsupported assumptions that, even if the Court had been presented with the argument at trial, the Court's ruling would have been the same—that the danger of confusing or misleading the jury would have substantially outweighed the probative value of the statement.

In any event, any potential error in the Court's exclusion of the statement was harmless. The Court afforded ProNav's counsel wide latitude in cross-examining Mrs. Carmody on her testimony that she had received a "clear diagnosis" of her husband's condition in Indonesia.[8] More importantly, the Court

7. Indeed, despite ProNav's professed indignation that the Court would not take at face value its argument that the statement was not being offered "for the truth" of its contents, ProNav now demonstrates in its reply brief that the "truth" of the statement was *exactly* what it cared about. (*See* Reply Memorandum of Law, filed May 7, 2004 ("Def. Reply Mem.") (Dkt.53), at 9 (arguing that "the notes Mrs. Lemiska initially testified she made during her telephone conversation with Dr. Tunjung *established plaintiff's glucose was 'OK,'* ... evidence that plaintiff's comatose state ... never existed or was not the result of hyperglycemia as [Dr. Babirak] claimed.") (emphasis added).)

8. On this very point, the Court permitted ProNav's counsel, over plaintiff's objection, to cross-examine Mrs. Carmody in detail regarding an e-mail she had sent to her family from Singapore, in which she had stated, after discussions with doctors, that there was "no clear diagnosis" at that time. (3/3/04 Tr. at 105–08; Def. Ex. N.) Further, because Mrs. Carmody testified on direct examination to a portion of her conversations with a doctor in Singapore, the Court permitted cross-examination with respect to the balance of that conversation, even though the doctor's remarks regarding Mr. Carmody's condition were hearsay. (3/3/04 Tr. at 101–02.)

received in evidence the actual laboratory report from the clinic in Indonesia where Dr. Tunjung had treated Mr. Carmody, and that report showed Mr. Carmody's actual level of glucose at that time. (Def.Ex. Z.) ProNav was free to cross-examine Dr. Babirak regarding the glucose levels shown on that report and to elicit testimony as to whether that information had been shared with him and, if so, whether he considered it in forming his opinion that Mr. Carmody's illness resulted from an untreated onset of diabetes.

### (b) *Dr. Tunjung's Offer of His Report*

The second issue now raised by ProNav with respect to statements made to Ms. Lemiska involves an e-mail message to her from Dr. Tunjung. That e-mail, about which Ms. Lemiska testified at her deposition, contained various substantive statements regarding Mr. Carmody's condition in Indonesia, including a statement that "[h]is vital sign[s] [were] getting better," that he was "in a state of unconsciousness," and that he had "developed a mild respiratory acidosis." (Lemiska Dep. Ex. D.) The e-mail eventually concluded with a request: "Please let me know if you need a copy of my report." (*Id.*)

At the outset of any argument by the parties regarding the admissibility of Ms. Lemiska's deposition testimony and deposition exhibits, the Court expressed concern about the admissibility of Dr. Tunjung's statements regarding Mr. Carmody's condition, observing, in general, that Dr. Tunjung's communications to Ms. Lemiska would be hearsay, if offered for the truth of their contents. (3/5/04 Conference at 2.) The Court then heard argument, in particular, with respect to the oral statement discussed above—that Mr. Carmody's "[g]lucose [was] OK." After ruling that this particular statement would be excluded, the Court asked ProNav's counsel, "Is there anything else in Mrs. Lemiska's [deposition] testimony beyond her discussions with Dr. Tunjung or Mrs. Carmody regarding Mr. Carmody's condition in Singapore that you wish to introduce from that transcript?" (3/5/04 Confer-

ence at 18.) ProNav's counsel responded only that he wished to introduce the mere fact that the phone call from Ms. Lemiska to Dr. Tunjung was made, and the Court stated that it would "not have a problem" with that. (*Id.*) Counsel did *not* mention, nor advance any argument, regarding Dr. Tunjung's request that Ms. Lemiska let him know if she needed "a copy of [his] report."

Had ProNav argued that this request by Dr. Tunjung was not a communication regarding Mr. Carmody's condition and that it was not being offered for the truth of its contents, the Court might well have accepted that argument, as the statement, taken on its face, is merely a request. Certainly, the statement is different in character than a statement regarding Mr. Carmody's glucose levels, or vital signs, or state of consciousness. ProNav, however, simply did not pursue the point.

Now, ignoring the fact that, at the time of trial, the Court invited further argument that ProNav chose not to make, ProNav argues in its post-trial motion that the Court committed critical error by excluding Dr. Tunjung's offer of his report to Ms. Lemiska. In explaining, belatedly, the supposed importance of this evidence, ProNav appears to argue that: (1) given that Mrs. Carmody asked Ms. Lemiska to try to gain information regarding Mr. Carmody's condition, it is inconceivable that Ms. Lemiska would not have accepted Dr. Tunjung's "offer" of his report; (2) it is logical to assume that Ms. Lemiska would not only have requested, but also received that report from Dr. Tunjung and would have then passed it on to Mrs. Carmody; and (3) as the report was not produced by plaintiff in discovery, it must have been deliberately withheld by plaintiff, as well as concealed from Dr. Babirak.[9] (Def. Mem. at 10–13; Def. Reply Mem. at 7–18.)

Once again, ProNav's arguments, even if they had been preserved, would not be sufficient to warrant a new trial. As Ms. Lemiska denied even requesting any report from Dr. Tunjung, there was no basis for the Court to find that any evidence had actually

---

**9.** It is worth noting that Ms. Lemiska's deposition testimony does not support any part of this hypothesis, as she testified that she did not, in

fact, follow up on Dr. Tunjung's offer and never requested, much less received, his report. (2/20/04 Tr. of Lemiska Dep. at 91–92.)

been withheld in discovery. (2/20/04 Tr. of Lemiska Dep. at 91–92) (answering "I did not ask for it" several times, in response to repeated questioning on the subject.) Further, ProNav's arguments on this point not only rest on numerous unsupported assumptions, but the underlying fact that ProNav wanted the jury to consider—that Mr. Carmody's sister was offered a particular medical report—is, at best, tangential to the issues in suit. The issues that were tried in this case were issues of negligence and injury. To the extent ProNav's defense turned on the purported inadequacy of Dr. Babirak's opinion regarding the cause of plaintiff's injury, the Court again notes that both a report from Dr. Tunjung, containing specific information regarding Mr. Carmody's condition in Indonesia, as well as a laboratory report from Indonesia, reflecting actual test results, were received in evidence and were available for ProNav to use in cross-examining Dr. Babirak. (Def Ex. Z; Pl.Ex. 20.) ProNav has offered no reason to suggest that the Tunjung report and laboratory results that were made part of the trial record would have been any different, in substance, from the Tunjung report that was offered to Ms. Lemiska in the doctor's e-mail, and, indeed, it does not appear that ProNav is even making such a suggestion. Under the circumstances, ProNav is hard pressed to explain how any ruling by the Court excluding Dr. Tunjung's offer of a report to Ms. Lemiska could possibly have undermined the fairness of the trial.

### B. *Testimony of Drs. Kinkead and Kelly*

ProNav also argues that the Court wrongfully excluded certain deposition testimony of Dr. Thomas Kinkead, a urologist who treated

Mr. Carmody upon his return from Singapore to Maine, and the proffered trial testimony of Dr. Christopher Kelly, an expert urologist. ProNav's post-trial arguments, however, mischaracterize earlier proceedings and ignore the arguments that ProNav itself previously advanced to the Court.

Shortly before trial, plaintiff sought to conduct a *de bene esse* deposition of Dr. Kinkead. ProNav objected, in part because it appeared that plaintiff may have been seeking to elicit expert testimony from Dr. Kinkead on the subject of what had initially caused Mr. Carmody's illness, and plaintiff had not previously designated Dr. Kinkead as an expert. On the representation of plaintiff's counsel that plaintiff did not intend to call Dr. Kinkead as an expert witness on the issue of causation, the Court permitted the deposition, but instructed plaintiff's counsel that he should focus his questioning on matters within the witness's knowledge as a treating physician, including what the doctor had observed of Mr. Carmody's condition and any treatment he had given to Mr. Carmody in Maine.[10] (*See, e.g.,* Letter to the Court from Michael X. Savasuk, Esq., dated February 18, 2004.)

Following the deposition, ProNav's counsel took the position that, despite the Court's instruction, plaintiff's counsel had in fact elicited opinion testimony from Dr. Kinkead on the subject of causation. When plaintiff then sought to designate that testimony to be read at trial, ProNav argued strenuously to the Court that the testimony should be excluded as a "previously undisclosed expert opinion" that was "unfairly prejudicial" to ProNav. (*See* letter to the Court from Noreen D. Arralde, Esq., dated February 20, 2004 ("2/20/04 Arralde Ltr.").)[11]

10. ProNav also objected to the deposition on the grounds that it was too late, and that counsel should not have to bear the cost of traveling back to Maine, where a number of depositions had already been completed on a prior trip by counsel. The Court ruled that, given the late timing and other circumstances, plaintiff should bear ProNav's travel cost for the deposition.

11. ProNav also took the position, at the deposition, that it needed to cross-examine Dr. Kinkead on any opinion testimony on causation that was elicited by plaintiff's counsel on direct examina-

tion. As a result, much of the opinion testimony that ProNav claimed was unfairly prejudicial was actually elicited on cross-examination. Prior to the commencement of trial, ProNav did not seek to designate any of that cross-examination for introduction at trial. In fact, ProNav argued that all portions of the direct examination that related to Dr. Kinkead's causation opinions, and that purportedly justified the cross-examination, should be excluded. (*See* 2/20/04 Arralde Ltr.; *see also* Letter to the Court from Michael X. Savasuk, Esq., dated February 20, 2004 (memorializing the testimony which plaintiff argued was

ProNav argued most vehemently that any testimony suggesting that Dr. Kinkead could "rule out" a bladder stone and resulting urinary tract infection as the precipitating cause of Mr. Carmody's illness was "highly partisan" and should be excluded by the Court. (*See id.; see also* Affidavit of Joseph T. Stearns, Esq., sworn to February 17, 2004 ("2/17/04 Stearns Aff."), at ¶ 7 (complaining of Dr. Kinkead's "refus[al] to consider any version of fact tending either to balance or contradict his opinion ... that UTI [urinary tract infection] could not have been a cause" of Mr. Carmody's illness).) Such testimony was at odds with ProNav's then-existing theory of causation, as expressed in the opinion of its own designated medical expert, Dr. Mark L. Spero. In the expert report produced by Dr. Spero in discovery, he had opined, in conclusion, that

> Mr. C[armody]'s devastating illness, with its complications and residual disability ... were the result of urinary tract infection causing otherwise minimal chemical diabetes to flair, eventually resulting in, frank urosepsis, hyperosmolar coma, and multi-organ failure. The likely underlying cause of the urosepsis was an occult bladder stone.

(9/8/03 Spero report at 6.)

ProNav was particularly unhappy with the testimony on causation given by Dr. Kinkead because it was, according to ProNav's counsel, unexpected. According to counsel, nothing in Dr. Kinkead's records could have suggested, prior to his deposition, that he would have excluded a urinary tract infection as the cause of Mr. Carmody's illness. On the contrary, according to ProNav, it fully expected that, if asked, Dr. Kinkead would have endorsed Dr. Spero's theory that a bladder stone and urinary tract infection were, in fact, the precipitating cause of the illness. (*See* 2/17/04 Stearns Aff. ¶ 10.) Thus, arguing not only prejudice from the content of Dr. Kinkead's testimony, but also surprise, ProNav's counsel not only sought to exclude the testimony, but also sought leave to retain a new medical expert—Dr. Kelly—to rebut it. ProNav proffered Dr. Kelly as an expert urologist who could directly counter the opinions given by Dr. Kinkead, by opining that a urinary tract infection, precipitated by a bladder stone, was, in fact, the cause of Mr. Carmody's illness. (*See id.* ¶¶ 9–10.)

Before trial, the Court dealt with the issues as follows: First, the Court ruled that Dr. Kinkead's testimony on causation would be excluded. The Court noted that plaintiff had represented that Dr. Kinkead would not be called as an expert witness on causation, and also reasoned that, if his causation testimony were excluded, there would then be no need for ProNav to call an expert urologist merely to counter it. Second, in denying ProNav leave to call Dr. Kelly as an expert on the issue, the Court noted that Dr. Kelly's proffered testimony would, in any event, be cumulative of testimony ProNav was already prepared to offer through its previously-designated medical expert, Dr. Spero. The Court further noted that ProNav presumably believed that Dr. Spero, as an internist, was qualified to offer the opinion he had advanced in his report, and thus that it would not be necessary for ProNav, at the last minute, to call a second medical expert to opine as to the exact same conclusion. (*See, e.g.,* 2/23/04 Tr. at 12–14 (placing on the record the arguments and rulings made during a pre-trial telephone conference).)

Once at trial, however, ProNav changed its position by 180 degrees, suddenly asserting that, in light of laboratory tests from Indonesia (which, by ProNav's counsel's *own account*, had been obtained "nearly a month and a half *before* Dr. Kinkead was deposed)" (*see* letter to the Court from Noreen D. Arralde, Esq., dated February 17, 2004 (emphasis in original)), the opinions to which Dr. Kinkead had testified at his deposition—particularly his expressed belief that no one would ever know what caused Mr. Carmody to become ill (1/30/04 Tr. of Kinkead Dep. at 99)—were in fact sound, and the expert report of Dr. Spero that the illness was caused by a urinary tract infection was in fact wrong and needed to be changed. On the day of jury selection, ProNav's counsel appeared in Court with an entirely rewritten and substantively altered report from Dr. Spero, attempting to replace the version that had

objectionable, and responding to those objec-    tions).)

been produced to plaintiff's counsel in discovery, months earlier. (*See* Letter to Mr. Stearns and Ms. Arralde from Marc L. Spero, dated February 22, 2004 ("2/22/04 Spero Ltr."); 2/23/04 Tr. at 23–24.)

In his revised report, Dr. Spero abandoned his prior opinion, and instead concluded that neither he nor "anyone else" could "confidently or reliably point to any particular diagnosis as the cause of Mr. Carmody's illness." (2/22/04 Spero Ltr. at 2.) Dr. Spero then went on to speculate that, if he were "forced to make an educated guess, [he] would say that viral encephalitis [was] the most likely explanation for the totality of the clinical picture." (*Id.*) Upon reviewing this wholly-changed report, the Court ruled, over plaintiff's vehement objection, that, provided plaintiff was afforded an opportunity to depose Dr. Spero regarding his changed opinion before Dr. Spero took the stand, ProNav would be permitted, at trial, to elicit from Dr. Spero his new opinion, except for his stated "guess" regarding viral encephalitis, which was speculative on its face. (2/24/04 Tr. at 165–72.)

Thus, the Court essentially ruled three times in ProNav's favor: First, the Court accepted ProNav's argument that plaintiff's counsel should not be permitted to offer Dr. Kinkead as an expert on causation. Second, the Court accepted ProNav's argument that, to the extent Dr. Kinkead gave expert testimony at his deposition, that testimony was unfairly prejudicial to ProNav and should be excluded at trial. Third, over plaintiff's objection, the Court then accepted ProNav's argument that its own designated medical expert should be permitted, at the very onset of trial, to change fundamentally the position he had taken during discovery.

Accordingly, ProNav's post-trial claims of error are disingenuous. Knowing full well that the Court, at ProNav's request, ultimately permitted Dr. Spero to testify to *the very same opinion* given by Dr. Kinkead at his deposition [12] (about which ProNav had then asserted outrage (*see supra* at 17–18)), ProNav is now reduced to arguing that it was error for the Court to keep from the jury Dr. Kinkead's testimony on causation, because, according to ProNav, the jury would have tended to trust Dr. Kinkead, as an " 'unbiased' treating physician," more than it would have trusted Dr. Spero, an expert retained by defendant. (*See* Def. Mem. at 15.) But, of course, while Dr. Spero professed to have studied Mr. Carmody's medical history so as to have a basis for giving an expert opinion on causation, Dr. Kinkead did not, as ProNav itself originally pointed out, making his testimony on causation less reliable, not more so, than Dr. Spero's.[13]

And as to the Court's supposed error in excluding the testimony of Dr. Kelly, the Court notes that the *only* reason originally advanced by ProNav as to why it needed Dr. Kelly was that it needed to rebut the supposedly prejudicial testimony of Dr. Kinkead— testimony it now claims was excluded by the Court in error. The Court further notes the paradox in ProNav's current argument: Dr. Kelly's proffered expert testimony precisely mirrored Dr. Spero's original report, which, at the last minute, ProNav withdrew and replaced with a wholly different, and supposedly corrected, report. The "corrected" opinion proffered by Dr. Spero was that the available medical evidence was insufficient to support *any* medical conclusion, by *anyone*, as to what had caused Mr. Carmody's illness. Thus, under ProNav's own revised theory, no one, including Dr. Kelly, would have been able to testify to a reasonable degree of

---

**12.** Indeed, ProNav's counsel even argued this point to the Court in support of its request that it be permitted to introduce the "corrected" opinion of Dr. Spero. (*See* 2/24/04 Tr. at 168 ("Dr. Spero . . . has joined the opinion of Dr. Kinkead . . . .").)

**13.** Dr. Kinkead testified at his deposition that he had not reviewed any records of Mr. Carmody's treatment while in Indonesia and Singapore, and that he had no knowledge of what had happened there. (1/30/04 Tr. of Kinkead Dep. at 60.)

Thus, ProNav's current statement in its moving brief, that "the Court clearly missed the point that Dr. Kinkead, as a treating physician involved in plaintiff's medical care, was qualified to offer an expert medical opinion as to causation of plaintiff's illness" (Def. Mem. at 15), is not only contrary to ProNav's own initial arguments to the Court (*see* 2/20/04 Arralde Ltr. (objecting to any portions of Kinkead's testimony on causation)), but also demonstrably incorrect.

medical certainty as to what had caused the illness.[14] Under the circumstances, ProNav can hardly claim prejudicial error from its inability to call Dr. Kelly to the stand.

Finally, even if the Court were to ignore the flaws in ProNav's convoluted and revisionist logic, there would be no merit to ProNav's argument that the trial, overall, was rendered unfair by the Court's exclusion of either Dr. Kinkead's opinion testimony, or that of Dr. Kelly. The Court made no ruling that would have excluded any testimony of Dr. Kinkead regarding matters within the scope of his diagnosis and treatment of Mr. Carmody, or any rulings that would have excluded Dr. Kinkead's medical records relating to his examination and treatment of Mr. Carmody in Maine. Moreover, the Court received all of the offered medical records from the Maine hospital and rehabilitation center where Mr. Carmody received care. (*See* Pl.Ex. 19.) The Court also received in evidence, over objection, the laboratory report from Indonesia that ProNav itself claimed to be the best evidence of what had transpired at the relevant time. (Def.Ex. Z.) The Court also received in evidence the only contemporaneous medical records from Singapore that were made available. (Pl.Ex. 6.) Further, as explained above, the Court ultimately received in evidence a report from Dr. Tunjung, Mr. Carmody's doctor in Indonesia (Pl.Ex. 20), and a letter from Dr. Swee, one of Mr. Carmody's doctors in Singapore, summarizing their medical findings (Pl.Ex. 7). To the extent there were any actual findings or reports relating to Mr. Carmody's having (or not having) a bladder stone or urinary tract infection, such findings would have been contained in these various documents, and they were all fully available for ProNav to use at trial, both to support Dr. Spero's expert testimony and to undermine the testimony of plaintiff's expert witness, Dr. Babirak. Thus, ProNav's core argument on this motion—that the Court systematically excluded all relevant medical evidence that could have been used to challenge plaintiff's theory of causation—is plainly belied by the record.

## II. WEIGHT OF THE EVIDENCE

ProNav has also moved for a new trial on the ground that the Court's purported errors regarding the admissibility of certain evidence resulted in a verdict on liability that was contrary to the weight of the evidence (*see* Def. Mem. at 25; Def. Reply Mem. at 3–5), and that the jury's award of damages was "wildly out of proportion to the evidence" (Def. Reply Mem. at 5). These arguments also fail, for the reasons discussed below.

### A. The Jury's Finding of Liability Under the Jones Act

The elements of a claim of negligence under the Jones Act are (1) that the plaintiff was a member of the crew of a vessel and that he was acting in the course of his employment, (2) that the defendant was the plaintiff's employer, (3) that the defendant or one of its officers, employees, or agents was negligent, and (4) that such negligence played any part, no matter how slight,[15] in bringing about an injury or illness to the plaintiff. *See, e.g., Williams v. U.S.,* 712 F.Supp. 1132, 1135 (S.D.N.Y.1989) (collecting cases). In this case, there was no dispute as to the first and second elements. Thus, for the jury's verdict on liability to be upheld, it must only have been in accord with the weight of the evidence as to the second and third elements—negligence and causation of injury.

### 1. Legal Standards

The determination of whether to grant a motion for a new trial brought pursu-

---

14. To the extent ProNav had any desire to offer alternative theories of causation—that Mr. Carmody's illness had an unknown cause or, alternatively, was caused by a urinary tract infection or obstruction—the Court notes that ProNav was actually able to introduce evidence of both of those theories at trial. Dr. Spero was permitted to testify to his belatedly-adopted view that the cause of Mr. Carmody's illness was unknown. And even though the Court excluded Dr. Kelly's proffered testimony that a bladder stone or uri-

nary tract infection was the cause of Mr. Carmody's illness, the Court did receive in evidence that same opinion from Dr. Syed Kazmi, another of plaintiff's treating physicians (10/23/03 deposition of Dr. Kazmi ("Kazmi Dep."), played for the jury on 3/1/04 and admitted as Pl.Ex. 50A, at 54–55), as ProNav itself points out in its motion.

15. *See supra,* n. 2.

ant to Rule 59 is a matter that rests in the discretion of the trial judge. *Marcoux v. Farm Serv. and Supplies, Inc.*, 290 F.Supp.2d 457, 462 (S.D.N.Y.2003) (citing *Amato v. City of Saratoga Springs*, 170 F.3d 311, 314 (2d Cir.1999)).

■ "A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Atkins v. New York City*, 143 F.3d 100, 102 (2d Cir.1998) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 911 (2d Cir.1997)). In determining whether the "jury has reached a seriously erroneous result or . . . [a] verdict [that] is a miscarriage of justice," the Court need not view the evidence in the light most favorable to the non-movant and may independently weigh the evidence. *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1047 (2d Cir.1992) (citations omitted); *Sharkey v. Lasmo*, 55 F.Supp.2d 279, 283 (S.D.N.Y.1999), *aff'd* 214 F.3d 371 (2d Cir.2000). But although "a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict," *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 54 (2d Cir.2000) (quoting *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998)); *Song*, 957 F.2d at 1047, the standard to order a new trial is still a "strenuous one," *Sharkey*, 55 F.Supp.2d at 283. The trial judge should "view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts; and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice." *Id.* (quoting *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir.1978)).

### 2. *Negligence*

■ As noted above, ProNav does not devote its motion to arguing that the jury's finding of negligence was against the weight of the evidence. Nonetheless, the Court will briefly summarize the ample evidence supporting the jury's finding that, in failing to provide Mr. Carmody with medical care on board ship, ProNav failed to exercise the same degree of care that a reasonably prudent person would have exercised under the circumstances. *See, e.g., Lombas v. Moran Towing and Transp. Co., Inc.*, 899 F.Supp. 1089, 1094 (S.D.N.Y.1995) ("Under the Jones Act . . . negligence is the failure to exercise reasonable care . . . under the circumstances."), *aff'd* 101 F.3d 685 (Table) (2d Cir.1996).

### (a) *The Apparent Seriousness of Mr. Carmody's Illness*

The testimony at trial was virtually uniform that, not long after his ship departed from Japan for Indonesia, Mr. Carmody appeared to be ill. According to Mr. Carmody, he first reported his illness to Captain James Blanton, the ship's captain, in the evening of August 24, 2000, the second day of the voyage, telling Captain Blanton that there was "something seriously wrong" with him. (2/24/04 Tr. at 184.) The next day, Officer Frank Ryan, the ship's First Mate, who, although he was not a doctor, served as the ship's medical officer, came to check on Mr. Carmody. (*Id.*) Mr. Carmody testified that, at the time, he reported a number of symptoms to Officer Ryan, specifically that he was experiencing excessive thirst, dry mouth, frequent urination, a lack of energy, and leg cramping, and that he had also learned that his pre-voyage medical report indicated elevated glucose. (*Id.* at 184–85.) Officer Ryan denied that Mr. Carmody reported all of these symptoms at the time,[16] but he conceded that Mr. Carmody was "obviously sick." (3/4/04 Tr. at 68.)

Over the next few days, Mr. Carmody's health apparently deteriorated rapidly. He testified that he had to stay in bed most of the time, was barely able to go to his office, and stopped changing his clothes. (2/24/04

---

**16.** Relying on the "Illness Report" (Pl.Ex. 3) he had filled out at the time, Officer Ryan testified that Mr. Carmody had reported to him only the symptoms of "no energy, constant thirst, lower leg cramping, and upset stomach." (*See* 3/4/04 Tr. at 74.) Officer Ryan further testified that he did not learn of Mr. Carmody's elevated glucose until after Mr. Carmody had been taken off the ship on August 28, 2000. (*Id.* at 134.)

Tr. at 186.) He also testified that he was beginning to get "foggy" and confused. (*Id.* at 189.) He testified that, at one point, he apparently lost consciousness, at least for a time, slumping over his desk while filling out the engineer's "noon report." (*Id.* at 191.) He was found by the First Engineer, Albert Singleton, who "picked [him] up and [put] him to bed." (*Id.* at 193.)

Mr. Carmody further testified that he eventually became less lucid and that his speech became slurred. (*Id.*) He recalled that, after being put to bed by Mr. Singleton, he was at some point awakened by one of the Third Engineers, who gave him soup and Gatorade, which he drank, although he later woke up choking on his own vomit. (*Id.* at 193–94.) He also recalled that, later that same evening, the Third Engineer roused him from bed, urged him to take a shower, and put a chair in the shower stall for him. (*Id.* at 194–95.) Although Mr. Carmody testified that he was able to get to the shower stall on his own, he was unable to return to his bed without the assistance of two of the engineers. (*Id.* at 195.)

The sharp decline in Mr. Carmody's condition over the course of the several-day voyage was confirmed by eyewitnesses and not seriously contested at trial. Christopher Boetsch, who served with Mr. Carmody as a Third Engineer, testified that, three days out of Japan, he saw that Mr. Carmody was not eating and was "walking very slowly, just barely picking his feet up." (2/26/04 Tr. at 16.) Mr. Boetsch later observed Mr. Carmody "holding on [a] hand railing like he could hardly stand up" (*id.*), an observation also made by Mr. Singleton (*see id.* at 108). By August 27th, four days out of Japan, Mr. Singleton testified that he found Mr. Carmody "passed out across the front of his desk," so that Mr. Singleton had to entirely take over in preparing the noon report. (*Id.* at 109, 110.) Four or five days out of Japan, Mr. Boetsch observed that Mr. Carmody "couldn't even get out of his bed" (*id.* at 17), did not acknowledge the presence of others, and had "[s]hallow breathing," eyes that were only "half open," and lips that were "all dry and chapped" (*id.* at 18). Mr. Singleton also testified that, by this point, Mr. Carmo-

dy's condition had "[t]otally deteriorated," such that he "couldn't get up." (*Id.* at 109.) Mr. Boetsch confirmed that, after Mr. Carmody vomited on himself, and was cleaned in the shower, it took two men to get him back to bed. (*Id.* at 18.) Mr. Boetsch testified that, after that, the engineers stood watch over Mr. Carmody, as he lay in bed. (*Id.* at 19.)

By the time the ship arrived in Indonesia on August 28th, Mr. Carmody was plainly in desperate straits. When paramedics finally boarded the ship, they showed Mr. Boetsch that Mr. Carmody's skin, when pulled up away from the bone, "stood right up," like paper, and did not become flexible again until Mr. Carmody had been given several units of IV fluid. (*Id.* at 23, 28–29, 60.) In order to remove him from the ship, officers had to "strap[ ] him in an office chair with wheels on it," using duct tape to keep him in place. (*Id.* at 29, 114.) Mr. Carmody was eventually transferred to a stretcher and carried off the ship. (*Id.*) According to Mr. Singleton, Mr. Carmody, upon being taken off the ship, "looked like he was dying." (*Id.* at 115.)

### (b) ProNav's Policy Requiring the Crew To Seek Medical Assistance For an Ill Seaman

The undisputed evidence at trial showed that the ship in question, the LNG Gemini, was outfitted not only with a medical reference guide, but also with "hospital facilities," which stocked an inventory of medical supplies, including blood sugar test strips, insulin, and "IV" fluid. (*Id.* at 176–77; 2/27/04 Tr. at 157; *see also* 3/4/04 Tr. at 91.) It was also undisputed that the ship had a written operations manual that provided that the ship's chief mate was responsible for the medical welfare of the crew. (2/27/04 Tr. at 138–39.) The manual further provided that, should there be an illness or injury "beyond the immediate capability of the crew, medical advisory assistance *shall* be requested." (*Id.* at 153 (emphasis added).) Specifically, the manual stated:

> In the event of a medical emergency while a vessel is at sea, where you require medical advice on treatment, the primary point of contact for this advice shall be Dr. Woo

... located in Singapore.... This team of medical professionals speaks fluent English and is available 24 hours a day, 365 days a year.

(*Id.* at 157.)

At trial, Mr. Carmody called to the stand a former ProNav officer, Captain William Gatchell, to testify as an expert regarding the ship's medical guide, its operations manual, and, in general, the procedures that are supposed to be followed on a ProNav vessel when a crew member needs medical care. (*Id.* at 140.) According to Captain Gatchell, even if the master and chief mate on board the ship had been unable to determine from the ship's medical guide how to diagnose and treat Mr. Carmody based on his symptoms, the proper procedure, as well as ordinary prudence, would have dictated that they "pick up the phone and ... call for expert medical advice and counsel." (*Id.* at 181–82.)

### (c) ProNav's Failure To Seek Medical Assistance For Mr. Carmody

Officer Ryan, the ship's chief medical officer, effectively conceded at trial that he did nothing to assist Mr. Carmody. Officer Ryan testified that, from his first visit to Mr. Carmody onward, he did not give Mr. Carmody any treatment other than checking in on him periodically, checking his vital signs, making him comfortable, and ultimately putting a "watch" on him. (3/4/04 Tr. at 77–80.) Officer Ryan testified that, although it was evident to him that Mr. Carmody was ill, he "didn't know what was wrong," given that Mr. Carmody's vital signs "seemed fine." (*Id.* at 68, 77.) Officer Ryan maintained that, based on the limited information he had at the time (*see supra* n. 16), he could not diagnose Mr. Carmody using the resources available on board ship. (*Id.* at 81–83.)

It was undisputed at trial that neither Officer Ryan nor any other officer aboard the ship followed the requirement set out in the ship's operations manual, that on-shore medical advisory assistance be requested when a seaman presents with an illness that is "beyond the immediate capability of the crew." When Officer Ryan was questioned at trial as to why, during the course of this voyage, he did not call an on-shore doctor in accordance with that requirement, he testified that he really had nothing concrete to tell a doctor other than the fact that Mr. Carmody was "sick and he was getting sicker," and that he would have felt "kind of silly" calling a doctor without enough information for a diagnosis. (*Id.* at 81, 144–45.)

### 3. Causation of Injury

As discussed above, ProNav spends a great deal of time in its motion focusing on the issue of causation. Not only is this issue central to ProNav's arguments challenging the Court's various evidentiary rulings, but it is also central to ProNav's arguments challenging the jury's liability verdict.

The causation question, in this case, was whether ProNav's negligence, in not giving earlier treatment to Mr. Carmody, or even seeking advice as to how to give him such treatment, played any part in causing his critical illness and the consequences of that illness. It was on this question that Mr. Carmody offered the expert testimony of Dr. Stephen Babirak, the endocrinologist whose testimony is mentioned above in connection with the Court's consideration of ProNav's evidentiary motions. (*See supra* at Point I.) In sum, Dr. Babirak considered Mr. Carmody's various symptoms and the chronology of those symptoms, as described by Mr. Carmody at trial and as set out in the medical records, and concluded that, while on board ship, Mr. Carmody suffered from an onset of hyperglycemia (elevated blood sugar), which could and should have been treated with fluid, so as to have avoided the extreme, life-threatening progression of the condition that Mr. Carmody experienced. (*See generally* 2/27/04 Tr. at 6–22.)

Dr. Babirak relied on information he was provided by Mr. Carmody and his counsel: that, prior to boarding ship, Mr. Carmody was found to have a slightly elevated glucose level; that following a period of extreme working conditions (where Mr. Carmody assisted with repairs in a hot engine room), Mr. Carmody sweat profusely, consumed large amounts of liquid, and slept very little; that following that period he experienced exhaustion, frequent urination, and dry mouth; that he ultimately became so lethargic that he

was unable to get out of his bed, lost mental acuteness, and finally became completely unresponsive; that, when emergency technicians ultimately came aboard the ship and pinched Mr. Carmody's skin, the skin "stood up"; that after Mr. Carmody received three IV's of fluid, the "slackness" of the skin disappeared; and that when Mr. Carmody was put into the ambulance, it did not appear that he could speak, that his eyes appeared to be closed, and that he was pale and nonresponsive. (*Id.* at 7–14.) Based on all of this information, which was supported by evidence admitted at trial, Dr. Babirak testified to his diagnosis of hyperglycemia to a reasonable degree of medical certainty. (*Id.* at 15–16.)

Specifically, Dr. Babirak testified that "we've known for 15 centuries how diabetes presents when it becomes moderately symptomatic," and that Mr. Carmody developed "all of" the "classic signs and symptoms," which are" extremely predictable" and proceeded from "moderate to very severe to life threatening and to near death." (*Id.* at 16–17.) He explained how hyperglycemia progresses if untreated, noting that Mr. Carmody's condition mirrored that of the classic "clinical course," including his report of frequent urination, constant thirst, vomiting, altered mental status, and eventual loss of consciousness. (*Id.* at 17–21.) In Dr. Babirak's opinion, earlier treatment with fluid would have prevented Mr. Carmody from progressing to "vascular collapse" and coma. (*Id.* at 21–22; 3/3/04 Tr. at 41 ("I believe he would not have lost neurologic function if he was treated with IV fluids earlier.").) According to Dr. Babirak, the "standard medical practice" for Mr. Carmody's condition would have consisted of "first fluid, second fluid, third, fluid," which would have served to break the declining cycle, leading to multi-

system failure, that occurs in extreme cases of hyperglycemia. (2/27/04 Tr. at 22.)

Dr. Babirak also testified that his opinions as to Mr. Carmody's condition and its progression were consistent with, among other things, Mr. Carmody's apparent severe dehydration (*see id.* at 22–26), and Mr. Carmody's apparently positive response to the infusion of IV fluid he finally received, which, according to Dr. Babirak, "saved his life" (*see id.* at 25) (testifying regarding the glucose level reflected in the Bontang, Indonesia laboratory report (Def.Ex. Z)). Dr. Babirak further testified that his opinions were confirmed by both the medical report from the Bontang clinic, which showed diagnoses of "Diabet[es]," "Septic Anemia," and "Acute Renal Failure" (*id.* at 23–24 (referring to Pl.Ex. 20)), and the cerebral spinal fluid glucose level indicated in the laboratory report from the hospital in Singapore, to which Mr. Carmody was transferred (*id.* (referring to Pl. Ex. 6)).

ProNav cross-examined Dr. Babirak at length, seeking to challenge the bases and logic of his conclusions.[17] ProNav also argued extensively at trial that neither Mr. Carmody, nor anyone else, actually knew or could have determined what "triggered" his supposed loss of glucose control, and pointed to Dr. Babirak's testimony that such loss of control does not generally occur unless the patient suffers an underlying illness or disease process. (*Id.* at 115; 3/3/04 Tr. at 33.) As noted above, ProNav also introduced the expert testimony of Dr. Mark Spero (*see supra* at 20), to present evidence that the triggering cause of Mr. Carmody's illness was not currently known, and, based on the available record, could not now be determined with reasonable medical certainty. (*See* 2/22/04 Spero Ltr.)

All of this effort by ProNav, however, was largely beside the point. It was undisput-

---

**17.** The Court notes that it afforded ProNav's counsel substantial time and extraordinary leeway in conducting Dr. Babirak's cross-examination, tolerating extensive repetitive questioning. (*See, e.g.,* 2/27/04 Tr. at 76–77 (asking Dr. Babirak at least five time whether he had adopted the opinion of Mr. Carmody's counsel); 3/3/04 Tr. at 24–26 (asking Dr. Babirak at least six times whether certain blood pressure readings were consistent with his opinion); *id.* at 26–31 (asking

Dr. Babirak at least five times whether the information that Mr. Carmody's condition deteriorated at the Bontang clinic, and that Mr. Carmody became drowsy and vomited, was consistent with his opinion); *id.* at 31–34 (asking Dr. Babirak at least five more times whether it was his opinion, that, after being in a state of vascular collapse, or coma, the IVs served to revive Mr. Carmody until he further deteriorated the following day).)

ed—and undeniable—that Mr. Carmody presented with illness on board ship. The question was whether ProNav's failure to take any action to treat that illness, as it manifested itself at the time, in any way caused Mr. Carmody to become more seriously and dangerously ill. *Regardless* of whether the "triggering" cause of the illness was well established or, indeed, will ever be known, the fact remains that the ship's chief medical officer, by his own admission, essentially did nothing for Mr. Carmody, to the point of not even making a phone call to medical professionals to inquire as to what *could* be done. The further fact remains that the administering of fluid to Mr. Carmody was an available option on board ship, as it was undisputed that the ship had IV units in stock. Even further, the evidence was compelling that, from Mr. Carmody's appearance (regardless of what symptoms he reported or was able to report), it was obvious to the paramedics who finally boarded the ship that he was badly dehydrated.[18] Finally, ProNav offered no testimony or any other evidence at trial to counter Dr. Babirak's opinion that Mr. Carmody would have been helped by the earlier administering of IV fluid, which, according to Dr. Babirak, would have "br[o]ke[n] the vicious cycle" of Mr. Carmody's illness. (2/27/04 Tr. at 22.)

In any event, Mr. Carmody did not need to prove at trial that ProNav's failure to act was the sole cause of his critical illness and its lasting effects, but only that ProNav's breach of duty played a part, no matter how slight, in producing the injury for which damages were sought. Thus, Mr. Carmody was entitled to prevail on a theory that ProNav's negligence was an exacerbating cause of his critical illness, even if not the root cause. *See Gajewski v. United States*, 540 F.Supp. 381, 385–86 (S.D.N.Y.1982) (where plaintiff was forced to work excessive overtime hours aboard ship, after which he became sick and needed to be hospitalized, there was ample evidence to support the conclusion that plaintiff's illness resulted from defendant's negligence despite the fact that the "circumstances, nature and cause of [the plaintiff's illness] remain an enigma"); *Milos v. Sea–Land Serv., Inc.*, 478 F.Supp. 1019, 1023 (S.D.N.Y.1979), (denying motion for a new trial where the jury found defendant liable where its negligence had aggravated plaintiff's pre-existing arthritic condition rendering plaintiff unable to continue work as a chief marine engineer), *aff'd* 622 F.2d 574 (2d Cir.1980); *see also Gorman v. Prudential Lines, Inc.*, 637 F.Supp. 879, 881 (S.D.N.Y. 1986) (noting, on a motion for a new trial notwithstanding the verdict in a Jones Act claim, that an engineer was entitled to damages because stress from unsafe working conditions led to an angina attack, even where there was evidence presented that the attack would have been inevitable result of blocked arteries) (*cited in Shea v. Icelandair*, 925 F.Supp. 1014, 1025 (S.D.N.Y.1996) (in the context for a motion for a new trial, upholding verdict that defendant's conduct exacerbated plaintiff's physical symptoms even where there was testimony that, as a result of Parkinson's disease, plaintiff would have suffered certain of the same effects)).[19]

It is true that a jury is not permitted to speculate on proximate cause in the absence of reasonably persuasive proof on the issue. *See, e.g., Henry v. A/S Ocean*, 512 F.2d 401, 408 (2d Cir.1975). Here, however, given the lenient causation standard of the Jones Act, the strength of Dr. Babirak's testimony—which the jury was free to credit—and ProNav's complete failure to rebut Dr. Babirak's

---

**18.** Indeed, ProNav's own expert, Dr. Spero, acknowledged that the "tenting" of Mr. Carmody's skin could be a sign of dehydration. (3/4/04 Tr. at 42.)

**19.** *See also Sentilles v. Inter–Caribbean Shipping Corp.*, 361 U.S. 107, 109, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959) (noting, in a Jones Act case, that "[t]he jury's power to draw the inference [that defendant's negligence caused the plaintiff's injury] was not impaired by the failure of any medical witness to testify that it was in fact the cause. Neither can it be impaired by the lack of any

medical unanimity as to the respective likelihood of the potential causes of the aggravation [of plaintiff's medical condition], or by the fact that other potential causes of the aggravation existed and were not conclusively negated by the proofs."); *Fitzgerald v. A.L. Burbank & Co.*, 451 F.2d 670, 681 (2d Cir.1971) (In a Jones Act case, "[t]he jury decided whether or not there was proximate cause, and they may do so ... in the absence of direct medical testimony on the point.").

key opinion that the earlier administering of fluid to Mr. Carmody would have kept him from progressing to coma and critical illness, there is no basis for the Court to set aside the jury's verdict as against the weight of the evidence. Viewing the evidence as a whole, the jury's verdict was certainly not seriously erroneous or a miscarriage of justice.

### B. *The Jury's Award of Damages*

Finally, ProNav challenges the amount of the jury's damages award, arguing that "there was no evidence from which the jury could reasonably have concluded" that Mr. Carmody was entitled to $700,000 for past pain and suffering and $300,000 for future pain and suffering. (Def. Mem. at 25; Def. Reply Mem. at 5.) In its reply brief, ProNav also argues, for the first time in its motion, that a portion of the jury's award of lost wages was too speculative to be sustained. (Def. Reply Mem. at 32.)

### 1. *Legal Standards*

In deciding a challenge to a jury award, the Court must be mindful that the "calculation of damages is the province of the jury and that we should not disturb damages unless they are outside of a reasonable range." *Marcoux v. Farm Serv. and Supplies, Inc.,* 290 F.Supp.2d 457, 474 (S.D.N.Y.2003) (citations and internal quotation marks omitted). Damages need not be proven with "mathematical precision," *Sir Speedy, Inc. v. L & P Graphics,* 957 F.2d 1033, 1038 (2d Cir.1992), and the jury is entitled is entitled to make a just and reasonable estimate of the damages based on relevant data, and render its verdicts accordingly, *see State of New York v. Hendrickson Bros., Inc.,* 840 F.2d 1065, 1077 (2d Cir.1988).

■ In a federal question case, such as this one brought under the Jones Act, the Court will deem a damages award excessive if "it shock[s] the judicial conscience." *Pescatore v. Pan American World Airways, Inc.,* 97 F.3d 1, 18 (2d Cir.1996) (quoting *Matthews v. CTI Container Transp. Int'l Inc.,* 871 F.2d 270, 278 (2d Cir.1989)); *see Scala v. Moore McCormack Lines, Inc.,* 985

F.2d 680, 683 (2d Cir.1993) (quoting *Wheatley v. Ford,* 679 F.2d 1037, 1039 (2d Cir. 1982)). "In reviewing claims that the jury awarded excessive damages, the court views the evidence and draws all inferences in favor of the non-movant, here to the plaintiff, and accords significant deference to the jury's determination of factual issues." *Bachir v. Transoceanic Cable Ship Co.,* No. 98 Civ. 4625(JFK), 2002 WL 413918, at *10 (S.D.N.Y. Mar.15, 2002) (citing *Scala,* 985 F.2d at 683).

To determine whether a particular award is excessive, courts have often found it useful to look at other cases involving similar injuries, keeping in mind that any given judgment is based on its own facts and circumstances. *See, e.g., Nairn v. Nat'l R.R. Passenger Corp.,* 837 F.2d 565, 568 (2d Cir. 1988); *Lutnick v. New York City Health and Hosp. Corp.,* No. 89 Civ. 4217(JFK), 1994 WL 704804, at *4 (S.D.N.Y. Dec.16, 1994). The Court's task is to determine whether the award is in a reasonable range, and the Court should not reject an award simply because it fits at the higher end of that range. *Bachir,* 2002 WL 413918, at *10. In this case, the Court specifically charged the jury that any damages award must neither be excessive nor inadequate, but that it must be reasonable, and must reflect the damages actually caused by the defendant's negligence.

### 2. *Pain and Suffering*

■ The evidence regarding the initial suffering endured by Mr. Carmody aboard ship has already been summarized above. After he was removed from the ship on August 28, 2000 (of which he now has no memory (*see* 2/24/04 Tr. at 195)), Mr. Carmody was taken to the Bontang clinic in Indonesia, and, on August 30, he was transferred to Mount Elizabeth Hospital in Singapore. (*See, e.g.,* Pl.Ex. 7.) He was unconscious for at least a week, and remained hospitalized in Singapore for a total of 44 days, mostly in the Intensive Care Unit. (3/2/04 Tr.A[20] at 25; 2/24/04 Tr. at 198.)

---

20. On March 2, 2004 both Mrs. Carmody and plaintiff's damages expert, Mr. Soudry, testified.

That day's proceedings were transcribed at two different points in time, resulting in two bound

Mrs. Carmody testified graphically as to her husband's condition when she arrived at the hospital on September 3, 2000, stating that "he looked like a corpse that had been washed up out of a river. He was hugely bloated, swollen...." (3/2/04 Tr.A at 25.) She confirmed that he had "equipment going into various parts of his body. He was hooked up to a ventilator. An endotracheal tube ... going down his throat. Catheter *into the heart. Catheter into the penis....* IVs hooked up. [He was] wired up to all kinds of machinery and there was no response." (*Id.* at 25.) She also observed that "his arms were tied down, wrists were bound and his feet hung over the edge of the bed because the bed was too short for a big ... American man." (*Id.* at 26.)

When Mr. Carmody finally regained consciousness, he remembers being "told by a total stranger that [he] was in Singapore," but he was very confused as to how he had gotten there and what his condition was. (2/24/04 Tr. at 195.) He testified that, when he became aware of his condition, he realized that he was connected to a respirator, had IV's in both arms, had a catheter connected to his body, and that the bed was too small for him, causing his feet to hang off the end. (*Id.* at 196.) He also testified that, the first time he was moved from his bed to a chair in his hospital room in Singapore, he "cried for 15 minutes" because of the "sharp pain." (*Id.* at 197–98.) He testified that, emotionally, he was "anxious" and "depressed," and that he had "vivid" hallucinations and dreams, which "still bother [him] today." (*Id.* at 201–02.) Mr. Carmody also described the physical therapy that he started to receive while he was still in Singapore as "exhausting, grueling, and painful." (*Id.* at 199.) Mrs. Carmody testified that, throughout this time in Singapore, her husband appeared to be in incredible pain, fearful, confused, and depressed. (3/2/04 Tr.A at 30–33.)

On October 14, 2000, Mr. Carmody was finally able to return to Maine, after a difficult trip. (*See id.* at 37–39; 2/24/04 Tr. at 199–200.) He spent three days in the Maine Medical Center, and was then moved to the New England Rehabilitation Center, an affiliated facility, where he spent another 16 days. (2/24/04 Tr. at 208.) Mr. Carmody's doctor at the New England Rehabilitation Center, Dr. Syed Kazmi, testified to Mr. Carmody's debilitation at the time he was admitted to the Center and to his need for "aggressive rehabilitation." (Kazmi Dep. at 8–9.) Mr. Carmody himself testified that, by the time he arrived in Maine, he had lost over 55 pounds, was wheel-chair bound, and was "very emotional [and] confused." (2/24/04 Tr. at 209–10.) He also described for the jury the substantial pain he endured during the rehabilitation process. (*Id.* at 209–11, 214–15.) Mr. Carmody testified that, when he left the New England Rehabilitation Center, he was walking, but "with a cane"; he was anemic; and he "still had a lot of problems with continuity [of] events and emotions." (*Id.* at 217–18.) Mr. Carmody continued in the rehabilitation program as an out-patient for several more months, until May of 2001. (*Id.* at 234; *see also* Kazmi Dep. at 11–18, 21 (describing Mr. Carmody's treatment as an out-patient).)

Mr. Carmody and his wife both testified, as well, to the current, lingering physical effects of Mr. Carmody's illness, and as to how the residual effects of his critical illness have continued to impact his daily life and his enjoyment of life's activities. (2/24/04 Tr. at 244–49; 3/2/04 Tr.A at 49–52.) For example, Mr. Carmody testified that he still does not have any feeling in his feet, his gait has been altered, he has difficulty moving his hands, and he has a continual ringing in his ears. (2/24/04 Tr. at 246, 249.) He additionally testified that he is unable to enjoy physical leisure activities as he used to. (*Id.* at 245–46.) Mrs. Carmody testified about several activities that she and her husband can no longer enjoy together because of his limitations, and about the things that Mr. Carmody can no longer do around the house. (3/2/04 Tr.A at 49–52.)

Ignoring almost all of the testimony in the record regarding the substantial pain and

---

transcripts, each bearing the same date and beginning at page one. The transcript containing Mrs. Carmody's testimony will be referred to herein as "3/2/04 Tr.A," while the transcript containing Mr. Soudry's testimony will be referred to as "3/2/04 Tr.B."

suffering Mr. Carmody endured both initially and after he emerged from coma to begin a prolonged recovery from critical illness, Pro-Nav argues that jury's $1 million award for pain and suffering was "grossly excessive" and the result of "bias, passion or prejudice." (Def. Reply Mem. at 1.) According to Pro-Nav, if this award doesn't "shock the conscience, nothing can." (*Id.* at 31–32.) Yet despite ProNav's attempts to minimize Mr. Carmody's pain and suffering,[21] the testimony heard by the jury on this subject was credible and does support the jury's award. Indeed, the illness suffered by Mr. Carmody, and the consequences of its aftermath, appear to have been far more severe than the injuries described in many cases where juries have awarded sums in the same range.[22] *See, e.g., Scala,* 985 F.2d at 684 (award of $750,000 would be fair compensation for past and future pain and suffering for a knee injury which required arthroscopic surgery, left seaman wheel-chair bound for six months, and resulted in chronic knee swelling and back pain); *Wright v. Maersk Line Ltd.,* No. 99 Civ. 11282(LMM), 2003 WL 1900828, at *1–3 (S.D.N.Y. Apr.16, 2003) ($710,000 for past and future pain and suffering resulting from delayed medical care for illness which occurred aboard ship and which ultimately resulted in liver surgery); *Bachir,* 2002 WL 413918, at *10 (award of $1,250,000 for past and future pain and suffering for seaman who fell and suffered a back injury, as well as Post Traumatic Stress Disorder, was not excessive and was supported by the weight of the evidence) (citing cases); *Pace v. Nat'l R.R. Passenger Corp.,* 291 F.Supp.2d 93, 103–104 (D.Conn.2003) (award of $1,275,000 in past and future pain and suffering was not excessive where plaintiff railroad worker suffered from two herniated disks and testified extensively regarding his substantial physical suffering as well as mental anguish and loss of enjoyment of life's activities, and where there was credible evidence that his pain and limitations would continue in the future).

Not only do the above-cited cases show that the jury award of $1 million for pain and suffering in this case was not excessive as a whole, but most of that award (70%) was for Mr. Carmody's past pain and suffering, which was unquestionably severe, and which ProNav barely challenges. Further, Mr. Carmody's injuries were not of the ordinary kind, and the seriousness of his illness, which nearly resulted in his death, makes this case more compelling than the garden-variety case involving an injury aboard ship. *See, e.g., Shea,* 925 F.Supp. at 1025 ("[T]his case is set apart by the magnitude of the physical injuries suffered by the plaintiff."); *see also Marcoux,* 290 F.Supp.2d at 478 (although the jury verdict for pain and suffering was on the "high end of the spectrum ..., given the severity and debilitating nature of plaintiff's ... injuries, the award [was] solidly within that spectrum and fairly reflect[ed] the nature and extent of the injuries sustained, the permanence and extent of the pain caused by those injuries, [and] the loss of enjoyment of life...."). On the facts and circumstances of this case, the jury's award for pain and suffering does not shock the conscience, and, therefore, the Court will not disturb that award. *See Marcoux,* 290 F.Supp.2d at 478; *Milos,* 478 F.Supp. at 1021.[23]

21. For example, ProNav appears to argue that Mr. Carmody's only current symptom that could have resulted from his critical illness is "a little bit of numbness in his feet." (Def. Reply Mem. at 33.) As noted above, however, the Carmodys' testimony supports a finding that Mr. Carmody has suffered significant peripheral neuropathy, and that this has not been his only continuing physical problem.

22. Other than its bare assertion that the jury award is excessive, ProNav has not offered the Court any cases that may be considered similar to this one, for purposes of comparing the amounts of the jury awards. ProNav has thus failed to demonstrate that the verdict is, in fact, excessive. *See, e.g., Palmieri v. Celebrity Cruise*

*Lines, Inc.,* No. 98 Civ.2037(LAP)(HBP), 2000 WL 310341, at *8 (S.D.N.Y. Mar. 27, 2000). The Court notes, however, that Mr. Carmody has also neglected to place before the Court any comparable cases in which damages were awarded for similar injuries. In an effort to resolve this motion on the merits, the Court has independently surveyed some similar cases.

23. ProNav also appears to argue that the jury's award for future pain and suffering was suspect because the jury was not asked to specify the amount it was awarding for each future year, so that such specified amounts could then be discounted to present value by the Court. (*See* Def. Reply Mem. at 34.) Yet it was ProNav that

### 3. Lost Wages

■ Mr. Carmody testified at trial that, as a result of the residual effects of his illness, he had been unable to return to any position at sea that would require him to perform duties similar to his prior duties as Chief Engineer. (2/24/04 Tr. at 244.) Among other things, he testified that he had lost the feeling in his feet, and that, consequently, he is now unable to climb ladders, which would be necessary on board ship. (*Id.* at 247–48.) The jury accepted Mr. Carmody's testimony that, if he had not become ill, he would have continued to work at sea for at least some period of time (*see* 2/23/04 Tr. at 107–12), and awarded him lost wages for the first two years in the amount of $24,000 per year, and then for another three years thereafter in the amount of $97,000 per year.

ProNav does not challenge the initial two years of lost wages awarded by the jury. In its reply papers, however, it now argues that the additional amount of $97,000 per year, for the following three years, is unduly speculative. (Def. Reply Mem. at 32; *see also* Stearns Aff. ¶ 30.) Because this argument is raised for the first time in ProNav's reply brief, the Court need not consider it. *See Hughes v. JP Morgan,* No. 01 Civ. 6087(BSJ), 2004 WL 1403337, at *3 n. 3 (S.D.N.Y. June 22, 2004) ("The Court ... declines to analyze this argument on its merits because it was raised for the first time in a reply brief."); *Carbonell v. Acrish,* 154 F.Supp.2d 552, 561 n. 10 (S.D.N.Y.2001) (cases cited therein); *Playboy Enter., Inc. v. Dumas,* 960 F.Supp. 710, 720 n. 7 (S.D.N.Y. 1997), *aff'd* 159 F.3d 1347 (2d Cir.1998) ("Ar-

guments made for the first time in a reply brief need not be considered by a court.") (collecting cases); *see also U.S. v. Yousef,* 327 F.3d 56, 115 (2d Cir.) ("We will not consider an arguments raised for the first time in a reply brief."), *cert. denied,* —— U.S. ——, 124 S.Ct. 353, 157 L.Ed.2d 241 (2003); —— U.S. ——, 124 S.Ct 492, 157 L.Ed.2d 392 (2003); *Gaste v. Kaiserman,* 863 F.2d 1061, 1069 n. 6 (2d Cir.1988) (noting that the issue of the appropriateness of the damages award, raised for the first time in a reply brief, was waived).

In any event, ProNav's belated argument is unpersuasive. The crux of the argument is that, because the ship on which Mr. Carmody had served for 20 years (3/23/04 Tr. at 99) was "reflagged" after the voyage on which Mr. Carmody became ill,[24] neither his existing position as Chief Engineer on that vessel, nor any comparable job, was likely to have been available to him after that voyage. Thus, ProNav appears to argue that Mr. Carmody would have lost his high-paying job regardless of his illness, and, at best, would have only been able to work in a lesser job, with substantially lower pay. (Def. Reply. Mem. at 32.) The jury's award reflects the fact that the jury accepted ProNav's argument that, initially, Mr. Carmody would have had to accept a lesser position, but it also reflects that the jury credited testimony offered by a MEBA[25] union official, William McHugh, that, at least after a reasonable period of time, Mr. Carmody should have been able to move again into a higher-level

---

proposed to the Court that the jury *not* be asked, on the verdict sheet, to break down any such award by year. Further, as the Second Circuit has held, "it is artificial to expect the fact-finder to divide non-pecuniary damages into yearly installments," so that those installments can be discounted and then aggregated. *Oliveri v. Delta Steamship Lines, Inc.,* 849 F.2d 742, 751 (2d Cir.1988). The Court also notes that ProNav's counsel was not denied an opportunity to argue to the jury that any award for future non-pecuniary losses should be adjusted to account for the time-value of money, and that counsel never requested that the Court bring any general considerations regarding discounting to the jury's attention. *See id.*

**24.** When a ship is "reflagged," it is re-designated to sail under the flag of another nation. (*See*

3/23/04 Tr. at 104 (instructing the jury that to reflag a vessel means "to give [it] a new registered nationality").) In this instance, it was undisputed that the LNG Gemini was reflagged and that, as a consequence, it was no longer going to be staffed by members of the union to which Mr. Carmody belonged. Thus, as long as Mr. Carmody remained with the same union, he would have had to find work on a different vessel. (*See id.* at 106 (reflagging meant that the crew's "billet" aboard the ship was eliminated); 3/1/04 Tr. at 6.)

**25.** The Marine Engineers Benevolent Associations ("MEBA") District Number 1 was the union to which Mr. Carmody belonged. (*See, e.g.,* 2/23/04 Tr. at 105.)

position, commensurate with his level of skill and experience.

The jury was entitled to credit Mr. McHugh's testimony, which was based on his personal knowledge of jobs that were made available to MEBA members, through the union's hiring halls and otherwise. (*See generally* 3/1/04 Tr. at 10–14, 18–23.) Although ProNav contends that the "uncontradicted evidence was that permanent chief engineer's jobs are not available to plaintiff's unions hiring halls," (Def. Reply Mem. at 32), Mr. McHugh testified that he had personally been in the Boston hiring hall in 2001, had observed at least one open position for a chief engineer, and had in fact called Mr. Carmody regarding that position. (*Id.* at 18, 48.) Mr. McHugh further testified that, even if Mr. Carmody had not immediately found a chief engineer position, other positions, including relief positions, had been available for MEBA engineers with Mr. Carmody's experience throughout the period following the reflagging of the LNG Gemini, and that a relief position can turn into a permanent one. (*See id.* at 9, 19–22, 62–65.) Mr. McHugh also testified as to his knowledge regarding the different pay scales offered by different ship operators. (*Id.* at 43–46; Pl. Exs. 37–48 (charts reflecting the wage scale of various jobs within various shipping unions).)

In addition, Mr. Carmody introduced the testimony of a damages expert, Michael Soudry, with respect to the projected amount of Mr. Carmody's lost earnings. (*See* 3/2/04 Tr.B at 26–40, 51–54.) Among other things, Mr. Soudry testified as to Mr. Carmody's total life expectancy of 78.8 years, based on statistical tables. (*Id.* at 27.) Mr. Soudry also estimated that, based on labor force statistics, if Mr. Carmody had remained employed as a seaman, he could have been expected to work for at least another nine years, to age 63.6—if not to age 65. (*Id.*) After accounting for other income earned by Mr. Carmody in mitigation of damages, Mr. Soudry calculated Mr. Carmody's lost earnings based on such statistical information, on industry wage tables that had been provided to him (and that were made available to the jury), and on an assumption that Mr. Carmody would have first found work as a first engineer, and then progressed again to a chief engineer position. (*See id.* at 27–28, 37–39; Pl. Exs. 37–48, 52A–C.) [26]

In awarding lost wages to Mr. Carmody, the jury opted to award a lesser amount than that calculated by Mr. Soudry, apparently determining that Mr. Carmody would have continued to work as a ship engineer for only five years, not nine years or more. Such a determination was well within the province of the jury. Based on the statistical information provided by Mr. Soudry, the jury could have chosen to award Mr. Carmody future lost earnings over a longer period of time, totaling a larger amount. As it chose not to do so, it cannot be said that its verdict was excessive. *See Casey v. Long Island R.R.*

**26.** Prior to trial, the Court denied a motion by ProNav to exclude Mr. Soudry's testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The admissibility of expert testimony regarding future earnings capacity is within the wide discretion of the trial judge. *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir.1996); *Oliveri*, 849 F.2d at 745. Although the testimony of a damages expert should be excluded as unduly speculative if it is based on "assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison," "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher*, 73 F.3d at 22 (internal quotations and citations omitted). Projections of future earnings are admissible where, as here, they are supported by evidence such as wage scales or contracts, and where the jury is charged with determining the likelihood of the plaintiff's prog-

ress and is given sufficient information to enable it to do so. *Oliveri*, 849 F.2d at 745 (holding that the trial court did not exceed its discretion by admitting expert testimony on future compensation rates for marine engineer positions, where it was based on a MEBA union official's testimony regarding promotion, the jury was given information to assess the plaintiff's chances of promotion, and the jury was clearly instructed that the testimony was only relevant if they found that the plaintiff would have been promoted). In this case, the Court instructed the jury that it could only accept Mr. Soudry's opinion if it was satisfied that Mr. Carmody had proven by a preponderance of the evidence "that, had he not become ill, one, he would not have retired once the LNG Gemini was reflagged; two, that steady work as a first engineer and then as a chief engineer would have been available to him as of January 1, 2001, through a retirement age of 63-and-a-half or 65; and three, that he would have taken that work." (3/2/04 Tr. at 29.)

*Co.,* No. 01 Civ. 9751(RCC), 2004 WL 1609330, at *4 (S.D.N.Y. July 16, 2004) (where jury could have awarded plaintiff with greater damages for lost wages, but chose to award a lesser amount based on a shorter time period, "the award for lost wages is not excessive as a matter of law"); *Pace,* 291 F.Supp.2d at 103 (where plaintiff claimed that he would have worked until he was 65, but the jury chose to award lost wages based on a much earlier retirement age, "the jury's verdict was well below the amount they could have reasonably found"); *Milos,* 478 F.Supp. at 1024 (where the jury was entitled to award the plaintiff lost wages for the rest of his expected life work expectancy which would have resulted in an amount well in excess of the verdict, the amount it actually awarded was not excessive).

In sum, the jury's award of lost wages was supported by credible evidence in the record of actual job availability and job salaries, and was below what could have reasonably been awarded. Accordingly, the Court does not find the award to be either unduly speculative, or excessive.

### CONCLUSION

For all of the foregoing reasons, ProNav's motion for a new trial is denied.

SO ORDERED